**Carl OTTO, Appellant,**

v.

**KOPPERS COMPANY, Inc., a Delaware Corporation, and Wheeling Steel Corporation, a Delaware Corporation, Appellees.**

**No. 7401.**

United States Court of Appeals Fourth Circuit.

Argued April 12, 1957.

Decided July 10, 1957.

W. Brown Morton, Jr., New York City (Robert McKay, Pennie, Edmonds, Morton, Barrows & Taylor, John E. Hubbell, Myron Cohen, Hubbell & Cohen, of New York City, Frank A. O'Brien, Jr., and O'Brien & O'Brien, Wheeling, W. Va., on brief), for appellant.

Jo. Baily Brown, Pittsburgh, Pa. (Brown, Critchlow, Flick & Peckham, Pittsburgh, Pa., Schmidt, Hugus & Laas, and Wright Hugus, Wheeling, W. Va., John M. Crimmins and Karl B. Lutz, Pittsburgh, Pa., on brief), for appellees.

Before PARKER, Chief Judge, and SOBELOFF and HAYNSWORTH, Circuit Judges.

HAYNSWORTH, Circuit Judge.

This is a suit for infringement of Patent No. 2,599,067,[1] for the production of ammonium sulphate, which was issued to the plaintiff, Otto, on June 3, 1952.

1. The method of continuously producing sulphate of ammonia which comprises passing into a substantially unobstructed scrubbing space a gas containing free ammonia, contacting such gas with saturated ammonium sulphate solution containing free sulphuric acid, withdrawing ammonium sulphate liquor to make up such solution from a body of ammonium sulphate liquor in a crystallizing space below said scrubbing space, said contacting being effected by spraying by whirling motion and under such pressure so as to disperse said solution in fine spray over substantially the whole cross sectional area of the space and permit solid crystalline particles and supersaturated liquid spray to fall into said body whereby the growth of ammonium sulphate crystals in said body is promoted, withdrawing crystals from said crstallizing space and adding sulphuric acid to the liquor to make up for the acid combining with ammonia in the scrubbing space.

2. A method as specified in claim 1, in which the liquor introduced into said scrubbing space entrains ammonium sulphate crystals.

4. A method as specified in claim 1, in which the acid content of the liquor sprayed into the scrubbing space adjacent such gas inlet is about 5 or 6 per cent by weight, and in which the acid content of the liquor sprayed into said scrubbing space more remote from said inlet exceeds the first mentioned acid content.

7. The method of continuously producing sulphate of ammonia which comprises passing into a substantially unobstructed scrubbing space a gas containing free ammonia, contacting such gas with saturated ammonium sulphate solution containing free sulphuric acid and entraining solid crystalline particles and reacting with the free ammonia to form supersaturated ammonium sulphate liquor, withdrawing supersaturated ammonium sulphate liquor from said scrubbing space and desupersaturating the latter to make up all of said solution used in carrying out the method from a body of ammonium sulphate liquor in a crystallizing space below said scrubbing space, said

upon an application filed March 15, 1948. From a judgment holding the patent invalid for anticipation, the plaintiff has appealed to this Court.

The claims of the patent relate to a method of producing ammonium sulphate in crystalline form by reacting ammonia in coke oven gas with an acidified satu-

contacting being effected by spraying under such pressure so as to disperse said solution in fine spray over substantially the whole cross sectional area of the space and permit solid crystalline particles and supersaturated liquid spray to fall into said body whereby the growth of ammonium sulphate crystals in said body is promoted, withdrawing crystals from said crystallizing space and adding sulphuric acid to the liquor at a rate so related to the rate at which the ammonia containing gas is passed into said scrubbing space as to effect the reaction of substantially all of the ammonia in the gas with the acid, and make up, for the acid combining with ammonia in the scrubbing space.

8. A method as specified in claim 7, in which the gas passes first through an inlet portion and thence through an outlet portion of said scrubbing space, and including the step of adding make-up acid mainly to the liquor sprayed into the last mentioned portion of the scrubbing space.

14. In a coke oven by-product plant including apparatus for producing ammonium sulphate crystals by scrubbing coke oven gas containing ammonia with an acidified ammonium sulphate solution, the combination with structure formed with a crystallizing space and a substantially unobstructed scrubbing space, and including wall structure surrounding said crystallizing space and said scrubbing space, non-blocking spray nozzles mounted in said structure, said scrubbing space having a lower liquor and crystal outlet arranged to discharge into said crystallizing space, and having a gas inlet and a gas outlet each spaced away from said nozzles, each of said nozzles being arranged to discharge a liquor spray and crystals into an adjacent portion of said scrubbing space, said nozzles being arranged to disperse said spray over substantially the whole cross sectional area of said scrubbing space, gas conduit means connected to said structure and communicating with said scrubbing space for passing coke oven gas into said scrubbing space through said gas inlet and for withdrawing gas from said scrubbing space through said gas outlet, means connected to said structure for withdrawing saturated ammonium sulphate liquor and crystals from said crystallizing space and spraying said liquor and crystals into said scrubbing space and comprising pumping

means having inlet conduit means connected to said crystallizing space for the withdrawal of liquor and crystals therefrom, and having outlet conduit means for discharging liquor and crystals withdrawn from the crystallizing space and including a separate conduit connection to each such nozzle, and means for adding make-up sulphuric acid to the liquor passing from said crystallizing space to said nozzle means, at a rate so related to the rate at which the gas containing ammonia is passed into said scrubbing space that substantially all of the ammonia in the gas reacts with the surphuric acid to form ammonium sulphate liquor and crystals, whereby substantially all of the ammonium sulphate liquor sprayed into said scrubbing space is liquor which has been previously withdrawn from said scrubbing space.

15. Apparatus as specified in claim 14, in which said gas conduit means includes a gas supply pipe having a horizontal discharge end portion for passing a stream of coke oven gas horizontally through said gas inlet and through a portion of said scrubbing space adjacent to said gas inlet and in which a portion of the liquor spray discharged by said spray nozzles is passed into said scrubbing space portion adjacent said gas inlet.

16. Apparatus as specified in claim 14, including a pipe connected to said inlet conduit, means for connecting the latter to a source of cleaning fluid, and a valve in said pipe, whereby when said valve is open, cleaning fluid is sprayed into said scrubbing space through said non-blocking nozzles.

18. Apparatus as specified in claim 14, in which the structure forming the crystallizing space includes a vertically disposed, open ended pipe having its upper end open to receive ammonium sulphate liquor and crystals passing downward through said scrubbing space, and a receptacle of a larger horizontal cross section than said pipe and into which said pipe depends and which cooperates with said pipe to form a crystallizer space external to said pipe and receiving liquor adjacent its lower end through the open lower end of said pipe, first and second conduit connections to said receptacle at respectively low and high levels, said first conduit connection forming a portion of said pumping means through which the latter passes liquor and crys-

rated ammonium sulphate solution entraining crystals of ammonium sulphate. The basic method claims 1, 2, 4, 7 and 8 and the basic apparatus claims 14, 15, 16, 18 and 19, which are claimed to be infringed, are set forth in the margin.

Since the underlying principle was not new with Otto, the problem will be clarified by reference to the art as practiced in commercial installations in coke oven by-product plants prior to the time of the claimed invention in 1946.

Coke oven gas normally contains ammonia. If subsequent use of the gas is to be made, the ammonia is a deleterious substance and it is essential that substantially all of it be removed. The record indicates that a residue of as much as 3% of the ammonia content of the gas will be unacceptable in commercial practice. A residue of less than 1% is desirable.

It was well-known that ammonia readily reacts with sulphuric acid to produce ammonium sulphate. Passing coke oven gas through solutions containing sulphuric acid has long been known in practice as a means of extracting substantially all of the ammonia from coke oven gas and producing a useful byproduct, crystalline ammonium sulphate. The commercial practice of the art, however, developed along two more or less independent and parallel lines.

In 1940, most of the commercial installations in this country for the accomplishment of this purpose were saturators with one or more cracker pipes, the open ends of which were immersed to a depth of several inches in a bath of supersaturated ammonium sulphate solution containing sulphuric acid. The gas was pumped downwardly through the cracker pipe and the liquid seal of the bath from whence it bubbled up through the bath and passed on to an exhaust pipe above the bath.

This method was fully effective in cleansing the coke oven gas of the ammonia to an acceptable degree. Since the bath was a supersaturated solution of ammonium sulphate, crystals of ammonium sulphate were formed in the bath, the heavy ones falling to the bottom of the bath from whence they could be removed for subsequent processing and sale for use as agricultural fertilizer. Sulphuric acid was constantly added to replace that consumed in the formation of ammonium sulphate.

This apparatus tended to form fine salt which would cake in solid form on the

tals to said separator, and said second conduit connection forming a portion of said pumping means through which the latter passes liquor and entrained crystals to said spray nozzles, a second receptacle, and an overflow connection through which liquor in the first mentioned receptacle above said relatively high level overflows into said second receptacle.

19. In a crystallizing and reaction tank system for producing crystals of (NH4) 2SO4 by reaction of ammonia containing gas with H2SO4 solution, tank apparatus comprising a reaction tank section and a crystallizing tank section, said reaction tank section having an inlet for a conduit for passing the ammonia containing gas into an inlet portion of said reaction tank section, a spray nozzle with fluid rotating passage walls located adjacent said inlet so as to immediately contact the entering gas with spray reaction with the ammonia containing gas, a plurality of spray nozzles with fluid rotating passage walls located in an unobstructed portion of said reaction section, displaced from said inlet section, and arranged to cover the cross sectional area of said unobstructed portion with spray, and an outlet conduit for gas in said unobstructed portion, said crystallizing tank section being arranged to receive solution and crystals moving down from the bottom of said reaction tank section to said crystallizing tank section, a suspension conveying system including said crystallizing tank section, pumping means for conveying a suspension of crystals from a portion of said crystallizing tank section containing relatively large crystals to a crystal separating device, and conduit means connected to a portion of said conveying system which follows said portion containing relatively large crystals and which includes conduits through which suspensions of crystals are passed to the spray nozzles in the unobstructed portion of said reaction section and inlet means for the addition of fresh acid to said suspension conveying system.

apparatus itself so that it was necessary from time to time to "kill" the bath with water and acid in order to remove salt deposits from the apparatus. At such times the production of crystals, of course, was interrupted, though the cleansing of ammonia from the gas was not.

The cracker pipe installations required that gas be pumped against the head of the liquid seal of the mother liquor so that the pressure differential on either side of the saturator was as much as thirty-five inches of water. This operation was costly.

Numbers of people began to work on methods of reducing the pressure differential and the gas handling capacity of such saturators.

Upon an application filed in 1943, Patent No. 2,423,794 was issued in 1947 to the plaintiff in this action for a saturator having a flared mouth on the cracker pipe. The flared mouth caused the gas to pass more or less horizontally through the bath before bubbling upward to the surface. It permitted the apparatus to be operated with the cracker pipe immersed less deeply in the bath while successfully handling a given volume of gas. During the 1940's a number of installations of saturators of this design were made in this country including one by the defendant, Koppers, for the defendant, Wheeling Steel Corporation, at its plant at Follansbee, West Virginia.

Another method of removing ammonia from coke oven gas and converting it into ammonium sulphate was also known in commercial practice. For convenience this will be referred to as the "unsaturated system." Unlike the cracker pipe saturator, it employed an unsaturated solution of acidified ammonium sulphate. Passing gas upwardly through a tower through which an appropriate fluid was simultaneously being passed downwardly in the form of a spray or droplets had long been practiced as a means of removing dust and other substances from gases by reaction or absorption. As practiced for the removal of ammonia from coke oven gas, such towers, known as "scrub-

bers," in modern practice were packed with tile or other material. Gas was pumped into the bottom of the tower from whence it would flow upwardly through the spaces between the packing, while at the same time a solution of sulphuric acid, or of unsaturated ammonium sulphate containing sulphuric acid, was spread over the top of the packing by perforated pipes, spray nozzles or other suitable means. As the liquid flowed over and down the sides of the packing material, it came into contact with the upwardly flowing gas. The sulphuric acid in the liquid reacted with the ammonia in the gas to produce ammonium sulphate. It had been found that such packed towers produced a more intimate contact of the gas and the liquid than an unpacked scrubber. In the packed tower the use of a spray at the top of the tower was principally for the purpose of dispersing the liquid over the top of the packing, while the reaction was effected primarily in the spaces between the packing.

In the packed tower system it was imperative that any solution of ammonium sulphate employed as the liquid be unsaturated. If at any place in the system the liquid was brought to a state of supersaturation, fine salt would quickly form to clog the system and interrupt its operation. The unsaturated ammonium sulphate solution was withdrawn from the bottom of the packed tower and passed through evaporators and crystallizers where it was brought to a state of supersaturation resulting in the formation of crystals of ammonium sulphate.

Though the cracker pipe saturator was in far wider use in this country, the Wilputte Coke Oven Corporation in 1941 turned back to the packed tower system. Since the gas did not have to be pumped against a liquid seal the pressure differential was much less than in the cracker pipe saturators, and while crystals could not be formed in the scrubbing space itself, it was claimed that production in the ancillary evaporators, crystallizers and other equipment could be so con-

trolled as to produce larger crystals of more uniform size than in the cracker pipe saturators.

Shortly before then synthetic ammonia plants had begun to produce ammonium sulphate in larger and more uniform crystals than was ordinarily produced by the cracker pipe saturators. This was a very desirable quality and it was thought by officials at Wilputte that all coke oven by-product plants would have to meet the standards of the synthetic ammonia plants if they were to maintain their markets for ammonium sulphate crystals when the end of World War II permitted the synthetic plants to turn again to that market.

With similar concern for the quantity and quality of the ammonium sulphate crystals produced, William Tiddy, Director of Research of Semet-Solvay Engineering Corp., in 1941, had turned back to scrubbers.

From the foregoing it may be seen that as commercially practiced in this country in 1946, the production of ammonium sulphate crystals from coke oven gas, was accomplished by two different systems, one of which, the cracker pipe saturator, operated with a supersaturated solution of ammonium sulphate in the saturator itself, while the other, the packed tower scrubber, could operate only with unsaturated solutions of ammonium sulphate in the scrubber. Each system had distinct advantages and disadvantages. Except, however, for the use of sprays to supplement the work of the cracker pipe, which will be described later, no one in commercial practice had combined principles of the two systems in one installation.

In 1946 the plaintiff, Otto, developed the idea that he could obtain substantially improved results by starting with a scrubber of the type used in the unsaturated system, but stripped of all internal packing, grids or other obstruction, while spraying a solution of saturated ammonium sulphate containing entrained crystals, as used in the cracker pipe system, through spray nozzles. The spray nozzles were of a type which would result in a division of the liquid into fine droplets evenly distributed throughout the cross section of the spray. As coke oven gas was passed into the bottom of the spray tower, it passed through the sprays of saturated ammonium sulphate containing seed crystals and growth of those crystals began in the reaction area. In alternate apparatus, the sprayed liquid and the growing crystals were collected in a crystallizing pool in the bottom of the tower or drawn off to a separate crystallizer. In the latter alternative, growth of the crystals and the formation of new ones continued as the liquid passed through the pipe from the bottom of the scrubber into the crystallizer.

Otto avoided the formation of masses of fine salt within the scrubbing space by intentionally directing the sprayed liquid against the walls of the scrubber. This was done in a volume and at a velocity which proved to be sufficient to prevent the formation of fine salt on the walls of the scrubber.

Otto's first commercial installation of his "all spray saturator" was at the Lackawanna, N. Y., plant of Bethlehem Steel Company. Engineers and officials of Bethlehem Steel Company had been persuaded by Otto that his idea might have substantial merit, but they were so skeptical of its worth that they required him to so design and construct the saturator that it could be converted to a cracker pipe saturator in the event that the new idea proved impracticable or unworkable in operation. When this installation was completed in 1947 and was put in operation, its performance and results were demonstrated to be far superior to those possible under either of the systems previously practiced. Substantially all of the ammonia was removed from the gas while the production of crystals of good size and quality was substantially continuous in operation. The pressure differential of the cracker pipe saturators was greatly reduced, while the gas handling capacity was greatly increased.

Since the operation and maintenance of the spray saturator was comparatively easy, its outstanding results in handling larger quantities of gas and in producing crystalline ammonium sulphate, soon resulted in its general acceptance in the industry. Practical operators of coke oven by-product plants, observing the installation at Lackawanna, hailed it as revolutionary, while chemical engineers of the defendant, Koppers Company, Inc., in their training courses for their young engineers, explained and extolled the substantial advantages of the all spray saturator.

The defendant, Koppers Company, Inc., is a large engineering and construction company specializing in the design and construction of coke oven by-product plants and, since the plaintiff's demonstration of his Lackawanna spray saturator, it has installed a number of new saturators for coke oven plants. Since 1949, each of them has been a spray saturator, similar in principle and operation to the device described by the plaintiff in his patent. Otto Construction Company, of which the plaintiff is the President, has also built a number of such saturators since 1947. Each of them has been of the all spray type. The record does not disclose that any other type of saturator has been built in this country since the plaintiff's practice of his claimed invention became general knowledge in the industry.

Many of these new installations of spray saturators have been in replacement of cracker pipe saturators. The cracker pipe saturator had come into widespread commercial use at or about the time of the first World War. The gas handling capacity of the new spray saturator was equal to that of four to five of these old cracker pipe saturators, and many of them were thus displaced by the new spray saturator.

In 1916 a number of cracker pipe saturators had been installed in the Follansbee, West Virginia plant of the defendant, Wheeling Steel Corporation. These were replaced by the defendant, Koppers, in 1948–1949 with two flared mouth cracker pipe saturators. While the flared mouth cracker pipe saturators were new and far superior to the 1916 saturators they replaced, they were in turn replaced with spray saturators when only three years old. This was an impressive expression of tribute by the defendants to the new all spray saturator.

The defendants do not deny the superiority of the all spray saturator or that Otto was the first to construct such a device for the production of ammonium sulphate in a coke oven by-products plant. They contend, however, that what Otto did was not invention in the sense of the patent laws because (1) he employed principles well-known to chemical engineers, (2) his work was an evolutionary engineering advance resulting from the availability of materials (certain types of stainless steel and monel metal and effective means of welding them) the lack of which had prevented commercial practice of the known principles and (3) it was fully anticipated by prior patents and public uses. It becomes necessary therefore to examine the patents and uses claimed to be anticipatory and the contemporary work of others.

Jeremiassen

U. S. Patent No. 2,375,922

The patent upon which the greatest emphasis has been placed by the defendant, and by officials of the Patent Office at the time Otto's patent was being processed, is United States Patent No. 2,-375,922 issued on May 15, 1945, to F. Jeremiassen upon an application filed September 15, 1939. This Patent, entitled "Treatment of Solutions to Obtain Solid Matter Therefrom," reveals a process for increasing the concentration of a solution by reacting the solution with gas so as to cause the solution to precipitate a solid. Reference is made to its use in connection with a solution of ammonium sulphate reacted with a gas containing ammonia to produce ammonium sulphate, but the gas is not described as coke oven gas, and it would seem that the purpose and function of his process would be more readily served by use of

a gas containing a much higher content of ammonia than coke oven gas.

Jeremiassen proposed to pump a solution of ammonium sulphate in an approximately saturated state to the top of a tower. From there it was caused to fall by gravity in a "veil" or "freely falling shower" of liquid. Gas containing ammonia was introduced into a gas chamber, through which the veil or shower of liquid was falling. The chamber was so constructed that the gas, to be exhausted, had to pass through the shower of liquid. The walls of the gas chamber were carefully designed so that at no point would the veil or shower of liquid come into contact with any surface of the chamber until it fell into the pool of ammonium sulphate solution at the bottom. The solution was then withdrawn into a crystallizing chamber where it passed upwardly through crystals of ammonium sulphate.

Jeremiassen stated that his large volume of circulating solution produced a large contact surface between the liquid and the gas "without having to resort to the use of spray, or quite thin films of liquid as employed in scrubbers, as this would result in formation of fine salt and coatings caused by the limit of the metastable supersaturation being locally exceeded * * * ." He repeatedly specified and emphasized that at no point would the circulating solution exceed the limits of metastable supersaturation. He defined supersaturation within the metastable limit as being that "degree of supersaturation at which no crystals are formed."

The expert witnesses were not in agreement as to their definition of the word "metastable." On the one hand the witnesses for the defendants testified that it was an uncertain word and of indefinite extent but applied to that state of supersaturation within which the formation of new crystals at a given temperature and under specified conditions was comparatively small. They stated that it was a condition which was very difficult to maintain. On the other hand the plaintiff's witnesses testified that

solutions may be brought to a point above the saturation point and remain in a state of unstable equilibrium, without the formation or precipitation of a solid, for a comparatively short space of time. If a seed crystal is added to such a solution, the unstable equilibrium is upset and the solution becomes desupersaturated by an immediate precipitation upon the seed crystal and formation of others. Dr. Radasch, a witness for the plaintiff, performed a practical demonstration, bringing to the courtroom supersaturated solutions of sodium thiosulphate. By the introduction of a sodium thiosulphate crystal, the solution was immediately desupersaturated by precipitation of solids.

Whatever the differing opinions of the experts as to their understanding of the word "metastable," however, Jeremiassen has defined it for us as being within the limits of that degree of supersaturation within which no crystals are formed. Indeed in many ways, through the use of large volumes of liquid, the short time for the whole cycle of recirculation, the avoidance of any contact between the veil of liquid and any solid object, he emphasized the necessity of avoiding local supersaturation beyond the metastable limit at any place in the system other than the crystallizing chamber. Doubtless this would require precise control of the relative volume of the liquid and the gas and it is possible, as the defendants' experts contended, that it could not be maintained in practice, but Jeremiassen taught that it must be maintained.

Jeremiassen proposed that the circulating solution be passed upward through the bottom of the crystallizing chamber. As the solution passed through crystals at the bottom of that chamber it became desupersaturated and the crystals were caused to grow and new ones were formed. Desupersaturated liquid was drawn off from the top of the crystallizing chamber for recirculation. The plaintiff's experts testified that unless the crystallizing chamber "is made impracticably large" or, assuming that the proportions of the diagram shown in the

Jeremiassen patent were followed in an actual plant, crystals of ammonium sulphate would be present at the top of the crystallizing chamber and would be recirculated through the system. Witnesses for the plaintiff were in general agreement that if a plant were constructed in the proportions shown in the diagrammatic drawings of the patent, the recirculated liquor would contain some crystals, but they insisted that, while perhaps impracticable or uneconomic, they could design and construct a plant following the teachings of Jeremiassen in which the recirculated liquor would be free of crystals as Jeremiassen appears to have required.

The record does not indicate that any plant following the Jeremiassen patent has ever been built. Perhaps the difficulty of maintaining the circulating solution within the metastable limits and free of crystals, as emphasized by the experts, may explain why no such plant has even been built. But Jeremiassen's invention is described in the specifications and claims of his patent, and it cannot be said to have taught a result which an expert witness now states would follow from what, to Jeremiassen, amounted to practical difficulties to be avoided. The testimony of the defendants' expert witnesses would seem to lead to the conclusion that the patent in suit was anticipated by Jeremiassen, but their testimony was founded upon a misconception of the Jeremiassen patent, for the essential premise for the expert opinion was the theoretical operation of an actual plant if one were constructed in accordance with the diagrammatic drawings of the patent and in the precise proportions shown in those drawings.

 Diagrammatic drawings are required to be included in a patent application, where appropriate, for the purpose of illustrating the principles described in the specifications and claims. Except in design patents, the proportions shown in the diagrammatic drawings are not critical and they do not purport to be scale or working drawings. Application of Nash, Cust. & Pat.App., 230 F.2d 428;

Application of Olson, 212 F.2d 590, 41 C.C.P.A., Patents, 871. So long as the drawings fairly illustrate the principles described in the specifications and the claims, the patent is not made invalid because a precise projection to scale of the dimensions of the drawings would not produce a useful or suitable result, for it is expected that anyone practicing the patent would so proportion the dimensions as to follow the statements of the principles of the invention and procure the practical result envisioned by the patentee. See Crown Cork & Seal Co. of Baltimore v. Aluminum Stopper Co., 4 Cir., 108 F. 845.

One working in the field contemporaneously with Otto, with the Jeremiassen Patent in hand, presumptively, would have looked to the claims and specifications and the principles they express as illustrated in the diagrammatic drawings to discover the teachings of the patent. What Jeremiassen said and the principles he illustrates do not anticipate the patent in suit. It does not become anticipatory because, in the opinion of experts, an actual plant proportioned precisely in accordance with the diagrammatic drawings would not work in accordance with the principles and directions stated by Jeremiassen or because the practical difficulties he believed existed and sought to avoid in practice, might, by peradventure, have been found to be virtues. Skelly Oil Co. v. Universal Oil Produce Co., 3 Cir., 31 F.2d 427.

 The patent in suit requires the use of sprays under pressure, in contact with the walls of the scrubber and the circulation through the spray nozzles of ammonium sulphate solutions containing entrained crystals. The patent in suit requires precisely those things which Jeremiassen taught should be avoided. Indeed, the avoidance of those things, Jeremiassen stated, was essential to his invention and its practice.

Tiddy

U. S. Patent No. 1,997,757

In 1935 United States Patent No. 1,997,757 was issued to William Tiddy

upon an application filed August 15, 1931, for a "Saturator for the Production of Ammonium Salts and Process for Making Such Salts." Tiddy stated that the principal object of his device was to produce ammonium sulphate crystals larger than those produced in the ordinary saturator. This he proposed to accomplish by rotating cylinders in tangential contact with the surface of an acid liquid causing a spray to be thrown up tangentially to the surface of the cylinder in a space through which "suitable ammonia —containing gas" was passed.

The liquor bath was in an elongated reservoir so that crystals formed near the top were required to pass a substantial distance through the solution during which time they continued to grow until they reached a size substantially larger than those produced in the ordinary saturator and were ready to be withdrawn at the bottom.

Professor Radasch, a witness for the plaintiff, testified that he had worked with Tiddy prior to 1931 on various devices employing cylindrical rolls to produce a type of spray. These were in situations in which spray nozzles would not work, or at least Tiddy and Radasch believed that they would not. Though Tiddy, in his patent, did not refer to the presence of crystals at the top of his liquor bath, it was assumed by the expert witnesses that they would be present and would be thrown up in the spray by the rotation of the cylindrical rolls.

The device of the Tiddy patent bears little resemblance to the well-known spray scrubbers. It did purport by means of rotating cylinders to produce a spray of acidified liquid to react with ammonia in gases, but no plant was ever built in accordance with the teaching of Tiddy. Tiddy, himself, by 1941, had turned back to scrubbers operating on the unsaturated system as the best means of producing ammonium sulphate and later, as assignor of Semet-Solvay Engineering Corporation and Allied Chemical & Dye Corporation, obtained two patents upon claimed improvements in that art. The emphasis of his patent No.

1,997,757, was not on the method of obtaining the reaction but on the depth of the bath in which the crystals grew. The Tiddy patent had been public knowledge for more than eleven years, but neither the patentee nor the highly skilled engineers of the defendant turned to it as the answer to the problem upon which they all worked. No such structure was built, but Tiddy continued to work in the art of the unsaturated system while the defendant, Koppers, was seeking to solve the problem with cracker pipe variants which will be described below.

### Other Prior Patents and Publications Claimed to be Anticipatory

One of the other references in the prior art, patent No. 441,106 issued Nov. 18, 1890 to M. M. Monsanto shows a process for the vaporization of alkaline or saccharine liquids by passing air or some other appropriate gas through a rain of the liquid until the air or gas becomes saturated to or near the point of crystallization of solids. From the point of view of the defendants it adds nothing to Jeremiassen. The remainder of the prior patents and publications claimed to be anticipatory, disclose variants of scrubbers operated on the unsaturated system which is described above and which was well-known and had been in long use.

### The Underwood Experiment

In 1942 a Mr. Underwood, Superintendent of the Coke Oven Plant of Bethlehem Steel Company at Bethlehem, Pennsylvania, undertook to modify old cracker pipe saturators to reduce the pressure differential. He installed, in the saturator, pipes with spaced perforations through which he circulated mother liquor from the saturator. The pressure was sufficient to cause the liquor to emerge from the perforations in the pipe under pressure and these jets of liquor were divided into droplets by the use of splash plates. He reduced the depth to which the cracker pipe was immersed in the bath, his idea being to compensate for the inefficient operation

of the cracker pipe by the splash plate sprays in the gas after it had bubbled through the mother liquor. Underwood did not get away from the cracker pipe. While the seal of the mother liquor was reduced, the gas still had to be pumped through a liquid seal and was not pumped into an unobstructed space as called for in the Otto patent.

The testimony is not entirely in agreement as to the operation of the Underwood modification of the cracker pipe saturator, but it is clear that considerable difficulty was encountered and that, after approximately two years, the experiment was abandoned altogether. Thereafter the old saturators at Bethlehem were replaced by new saturators of the Otto flared mouth cracker pipe type which employed no ancillary or other sprays of any sort.

Underwood was attempting to lower the pressure differential, which was a problem in the operation of his old cracker pipe saturators, but clearly he had no idea of abandoning the cracker pipe.

### Koppers Cracker Pipe Variants

In the period 1943–1947 the defendant, Koppers, was itself experimenting with the recirculation of mother liquor in cracker pipe saturators much as Underwood had done. In its Monessen, Weirton, Seaboard and Aliquippa installations it used a spray of recirculated mother liquor with the addition of acid to supplement the operation of the cracker pipe. As Underwood's modification, these were only modifications of cracker pipe saturators in an effort to reduce the pressure differential, but in no way disclosed the concept of converting the open scrubber to the saturated system. Indeed, as the Underwood modification was abandoned and the saturators in Bethlehem replaced by Otto flared mouth cracker pipe saturators, so Koppers turned to the Otto flared mouth cracker pipe, and, in the period 1947–1949, the flared mouth cracker pipe without spray supplement appears to have been generally accepted by the defendants and others as the pre-ferred apparatus and a major advance over the old art.

From the foregoing it is apparent that while there have been many developments and improvements in scrubbers operating on the unsaturated system and in cracker pipe saturators operating on the saturated system, no one had undertaken to convert the old unpacked scrubber to the saturated system. In the concept of passing coke oven gas through an unobstructed scrubbing space and passing through it saturated ammonium sulphate containing entrained crystals in the form of a finely divided spray under pressure, so that both absorption of the ammonia in the gas and the crystallization of ammonium sulphate occurred in the spray in the reaction zone, Otto displayed a new approach. Though he achieved the efficiency of the most efficient cracker pipe saturators, his sprays were not merely an incidental supplementation of the work of the cracker pipe in an effort to reduce somewhat the depth of the liquid seal, for he abandoned the cracker pipe with its liquid seal altogether. Nor was it a mere improvement of scrubbers operating on the unsaturated system, for it did what everyone practicing and teaching in that branch of the art insistently avoided.

██ Where invention is clearly wanting, commercial success cannot lend validity to a patent. Great Atlantic & Pacific Tea Co. v. Supermarket Equipment Corporation, 340 U.S. 147, 71 S.Ct. 127, 95 L.Ed. 162; Ingersoll-Rand Co. v. Black & Decker Mfg. Co., 4 Cir., 192 F.2d 270; Vapor Blast Manufacturing Co. v. Pangborn, 4 Cir., 186 F.2d 230; Murdock v. Murdock, 4 Cir., 176 F.2d 434; Bulldog Electric Products Co. v. General Electric Co., 4 Cir., 105 F.2d 466. Where, however, it appears that the claims of the patent contain elements of novelty and invention within the meaning of the Act, commercial success tends strongly to overcome the defense that what was done was obvious to other persons of great skill shown to have been working in the same field in an effort to

accomplish the same objective. Loom Co. v. Higgins, 105 U.S. 580, 26 L.Ed. 1177; Lyon v. Bausch & Lomb Optical Co., 2 Cir., 224 F.2d 530; L-O-F Glass Fibers Co. v. Watson, 97 U.S.App.D.C. 69, 228 F.2d 40. This is particularly so in a field in which many highly trained engineers had been actively working and for years had been attempting to overcome the disadvantages of the methods and apparatus then known and the difficulties inherent in their operation. When the demonstrated success of plaintiff's all spray saturator caused practical men in the coke oven industry to hail it as revolutionary, highly qualified engineers in the employ of the defendant, Koppers, to teach its advantages and its virtues over all other methods and apparatus, the replacement of installations of the old apparatus (some of them only recently installed) with new all spray saturators, it is persuasive that it was not a thing readily apparent to other engineers skilled in the art.

Koppers itself did not complete its first installation of an all spray saturator until 1949. It first attempted to use splash plate sprays, but found that they would not operate with the requisite efficiency so that they were replaced with Spraco nozzles which had been specifically mentioned in the patent in suit. While Koppers thus appears to have copied all the essentials of Otto's invention, bearing in mind the revolutionary impact of the invention upon the industry, there is no explanation why Koppers did not turn to the all spray saturator earlier, if Otto's concept was apparent to its engineering personnel prior to the demonstrated success of Otto's installation. If there was any want of essential materials for the practice of the invention prior to 1946, they clearly were not wanting at that time. The use of stainless steel in the Seaboard and Otto flared mouth cracker pipe saturators, in the Monessen and Weirton cracker pipes installed in 1941 and the recirculation of mother liquor containing entrained crystals in the Monessen, Weirton and Seaboard installations of the defendant, Koppers, all indicate that it was not a want of materials which made the practice of the invention impossible prior to 1946, but rather it was the lack of the concept until it was demonstrated in practice by Otto.

Otto does not claim that his invention embodies any new discovery of chemical principles. His is a combination patent, each individual element of which was known in the art, but the combination and its concept were new, producing clearly improved results. What has been said above of the work of many skilled chemical engineers in the field, the impact of this patent upon the industry and the defendants' prompt adoption of the patented apparatus demonstrates its merit and utility and forecloses the suggestion that the combination was obvious to others working in the field. The oft quoted statement of Judge Hough in Kurtz v. Belle Hat Lining Co., 2 Cir., 280 F. 277, 281 is appropriate here:

"The imitation of a thing patented by a defendant, who denies invention, has often been regarded, perhaps especially in this circuit, as conclusive evidence of what the defendant thinks of the patent, and persuasive of what the rest of the world ought to think,"

a principle well recognized in this Circuit. Ackermans v. General Motors Corp., 4 Cir., 202 F.2d 642; Black & Decker Mfg. Co. v. Baltimore Truck Tire Service Corp., 4 Cir., 40 F.2d 910.

Revolutions, even in one branch of an industry, are infrequently the product of old ideas. Particularly in a field in which highly trained and skillful engineers were working, on various approaches, to achieve the result, the imitators can hardly be heard to say they knew all the while that the answer lay in the concept which, upon its disclosure, made their own work obsolete. This Court, under these circumstances, cannot find the concept wanting in inventive novelty.

Much of the argument in this Court involves the presumption of validity which automatically attaches upon the issuance of a patent. 35 U.S.C.A. § 282; Diamond Rubber Co. of New York v.

Consolidated Rubber Tire Co., 220 U.S. 428, 31 S.Ct. 444, 55 L.Ed. 527; Baker-Cammack Hosiery Mills v. Davis Co., 4 Cir., 181 F.2d 550, a presumption which is strengthened when, as here, there were extensive administrative proceedings concerned with the prior art, Reynolds v. Whitin Machine Works, 4 Cir., 167 F.2d 78.

The presumption is attacked first on the ground that relevant prior art was not cited by the Examiner in the Patent Office, particularly Tiddy, Patent No. 1,997,757. The patent in suit, however, was issued upon an application which was a continuation in part and consolidation of several prior copending applications, in one of which the Tiddy patent was cited. In the proceedings on the superseding application the Examiner (the same individual who had handled the earlier applications) was relying only upon Jeremiassen as being anticipatory, but reference was made to the earlier applications and the claim that the Tiddy patent was not cited or considered as a relevant reference in the Patent Office cannot be sustained. 35 U.S.C.A. § 120. See the opinion of Judge Soper in Gibbs v. Montgomery Ward & Co., D.C.Md., 19 F.2d 613, 616, affirmed 4 Cir., 27 F.2d 466.

Other patents and publications, particularly a German handbook for engineers, relating to the practice of the "unsaturated system" were not record references in the Patent Office, but other patents and publications in that branch of the old art were record references. Astute and enterprising attorneys can always find references not of record in the Patent Office, but if they do not involve some substantial element in the defense of anticipation which was not considered by the Patent Office, the failure to make them record references cannot weaken the statutory presumption.

The presumption of validity is next attacked upon the assertion that the patentee's use of the term "spraying by whirling motion" in his claims No. 1, 2 and 4 was a misrepresentation which misled the officials of the Patent Office.

The patentee, however, clearly disclosed to the Patent Office that he was referring only to the Spraco nozzle, as disclosed in an expired patent, No. 1,101,264 issued to one Eneas in 1914 and which was produced commercially by the Spray Engineering Co. of Somerville, Mass. This nozzle employs stationary turbine vanes which cause the major portion of the liquid to be given a "rapid swirling motion." A center jet strikes the rotating mass of liquid to produce a spray outside the nozzle of "equal density across its section." The plaintiff in this case stated clearly that the "whirling motion" occurred within the nozzle, not outside, and we cannot assume that the Examiner, with the Eneas Patent and the literature of Spray Engineering Co. before him, could have supposed that the droplets, after leaving the nozzle, would take a course in defiance of elementary laws of physics.

What the patentee sought was a spray having a uniform density throughout its cross section which was supplied by the commercially available Spraco Nozzle with its "swirling motion" within the nozzle. That it was a matter of some importance is demonstrated by the fact that the defendant, Koppers, in its first "all spray saturators" attempted to use splash plate sprays, but, finding them unsatisfactory, replaced them with Spraco nozzles.

The defendants' major effort to impair, or destroy, the presumption of validity ordinarily attaching to a patent, is of no avail.

Without aid of that presumption, however, we have found the plaintiff's invention to be meritorious. The plaintiff has accomplished a real innovation in the industry, the impact of which has changed the course of the practice of ammonium sulphate production. For just such innovations, the Patent Act was designed, and the plaintiff is entitled to its protection.

The judgment of the District Court is reversed and the cause remanded for further proceedings consistent with this opinion.

Reversed and remanded.