ENTRON of MARYLAND, INC.,
Appellant,

v.

JERROLD ELECTRONICS CORPORA-
TION, Appellee.

No. 8302.

United States Court of Appeals
Fourth Circuit.

Argued June 14, 1961.

Decided Oct. 13, 1961.

William D. Hall, Washington, D. C. (Richard S. Wright, Baltimore, Md., and Max L. Libman, Washington, D. C., on the brief), for appellant.

Israel Packel, Philadelphia, Pa. (Irving B. Grandberg, Baltimore, Md., on the brief), for appellee.

Before SOBELOFF, Chief Judge, and HAYNSWORTH and BOREMAN, Circuit Judges.

SOBELOFF, Chief Judge.

The two patents here in suit relate to a device used in effecting a tap-off of high frequency signals from a coaxial transmission line. Its primary use is in supplying the necessary impulse to an individual television set by connecting an auxiliary cable to the main line. The device, commercially known as the Fastee, is covered by U.S. Patent Nos. 2,694,-182 and 2,694,183. The application for the first, called "Impedance-Matching Tap-Off Coupler for Wave Transmission Lines," was filed on February 20, 1953, and for the second, an improvement patent, called "Tap-Off Coupler with Fixed Attenuation for Coaxial Lines," on September 29, 1953. Both issued on November 9, 1954.

Entron of Maryland, Inc., assignee of the patents, appeals from the District

Court's determinations of invalidity for lack of invention and non-infringement. D.C.D.Md.1960, 186 F.Supp. 483.

The coaxial cables with which we are here concerned consist of a central conductor surrounded by a tough insulating material called a dielectric, and surrounding this is a cylindrical conductor, usually a copper braid, which in turn is covered by an outer insulation. They are particularly adaptable to modern use in the transmission of high frequency, multiple-band television signals. With the advent of community television antenna systems, around 1950, the need arose for a device to connect a branch cable to a main transmission line. It was necessary to connect the outer conductor of the main cable with the outer conductor of the branch line and to connect the inner conductors of the two cables ·without shorting. Also, as the connection might be made outdoors, any device, to be satisfactory, had to be quickly installable and easily waterproofed.

The plaintiff's patent claims [1] describe two components. There is a metallic clamping means to hold the transmission line, which has two short pins to pierce the outer insulation of the cable and make contact with the tubular outer braid. There is also a threaded aperture

1. The pertinent patent claims are as follows:

2,694,182: "We claim:

"(1) Apparatus for coupling a branch coaxial line to an insulated coaxial transmission cable having a central inner conductor and a coaxial outer conductor spaced and insulated therefrom, comprising conductive clamping means having grooved means for firmly engaging a coaxial cable, and short piercing means for penetrating the outer insulating jacket of a cable held in said groove means, said clamping means having a threaded aperture axially intersecting said groove means, and a piercing terminal member having a threaded force-applying hollow shell member threadedly mounted in said aperture and a central conducting element mounted in said aperture, said element comprising a connector portion for engagement with the central conductor of a branch circuit coaxial cable and a piercing portion of sufficient length to engage the central conductor of a coaxial transmission line held in said groove, when said shell is threaded into said aperture, said two portions being aligned with their adjacent ends separated, and an impedance element in series with said two portions and included between and in firm mechanical force-transmitting engagement with said ends, said piercing portion being insulated from conductive contact with the coaxial outer conductor of an engaged transmission cable by a tough insulating layer surrounding and held by said piercing portion, and having conductively exposed piercing point, a rigid, mechanically strong insulating member between said connector portion and said force applying shell member in engagement with opposed surfaces of said connector portion and said shell member for transmitting a piercing force from said shell member to said piercing portion through said impedance element as said shell is threaded into said aperture.

"(2) The invention according to claim (1), and stop means on said piercing terminal member to limit the forward travel of said piercing member as said shell is threaded into aperture to position the point of said piercing member for conductive engagement with the center conductor of an engaged cable.

"(3) * * * the inner conductor being rigidly held and supported by at least a portion of the outer shell, the rearwardly extending end of said inner conductor constituting the central conductor and rearwardly extending end of the hollow shell constituting the outer coaxial conductor of a coaxial terminal for attachment of a branch coaxial conductor, and a substantial circuit balancing impedance element included between and in alignment with the ends of said inner conductor and within said outer conductor, the terminals of said impedance element being coextensive with said inner· conductor, said insulation between said inner conductor and outer shell comprising a mechanically rigid insulating member in engagement with opposed surfaces of said conductors for transmitting a piercing force from said outer shell to said inner conductor as said outer shell is brought into full threaded engagement with said clamping means."

With respect to the claims in No. 2,-694,183 the only one material is No. 5.

"(5) * * * said capacitor comprising two parallel spaced conducting plate members, a block of high-dielectric insulating material molded about said plate members and completely filling the space between them, one of said plate members being integrally connected to said piercing conductor, * * *.""

in the clamp into which is screwed the second component, having an insulated pin with an uninsulated point and a threaded metallic outer shell. The pin is forced into the cable to make contact with the solid inner conductor by engaging and screwing the threaded outer shell of the second component into the threaded aperture of the clamp. This is an application of the so-called "screw-jack" principle. The pin is rigidly constructed and serves as the terminal member of the tap-off's inner conductor and has attached thereto an impedance element. The outer shell, and the pin and impedance element are separated but rigidly joined by a mechanically strong dielectric. The rearward extension of the outer shell, dielectric, and inner conductor is constructed to form a connector for the branch line.

### Prior Art

The defendant argues that the plaintiff's patent is but an obvious combination of five parts, each of which is old in the art. To this end it introduced at the trial (1) patents showing an insulated pin with an uninsulated point, (2) patents showing either attachment or piercing by the screw-jack principle, (3) patents showing an integrally connected impedance element, (4) patents showing an internally included dielectric and (5) patents showing a metallic outer shell.

The prior art primarily relied on by the defendant to overcome the presumption of the patents' validity[2] is comprised of the 1401 and the Holt taps, in prior use, and the following patents: Kamen, 2,615,948, filed November 3, 1949; Brady, 2,677,108, filed March 22, 1950; Bennett, 2,798,204, filed June 30, 1951; Eriksen, 2,552,414, filed June 8, 1948; Weissmann, 1,136,384, filed March 18, 1914; Boothby, 2,598,671, filed October 16, 1945; Hall, 1,067,024, filed October 19, 1912; More, 2,758,280, filed May 29, 1952; and Cork, 2,490,622, filed May 15, 1943.

The 1401, a coupler manufactured by the defendant in 1950, was intended for use on the ¼ inch RG/59 cable, then predominant. To install the 1401 the transmission cable had to be severed and the device affixed to the loose ends. Internally the 1401 had a lead for the inner conductor of the transmission cable, intersected by a branch lead. The device had an attached impedance element and its internal parts were encased in a small "T" shaped metal container.

The Holt tap, marketed in 1951, could be used on the larger ½ inch RG/11 cable, then coming into commercial use. It did not require severing of the transmission line. With this device the cable was punched by a screw vise through to the solid inner conductor of the cable and an insulated pin with an uninsulated point inserted in the cavity. The pin served as the terminal member of the branch lead and had an attached impedance element. The pin and impedance were held in place by a "T" shaped metal container with the top of the "T" comprising a split flange sliding lock to hold the transmission line.

The Kamen patent, a "Coupler for Wave Transmission Lines," discloses a clamp, to hold the transmission line, having three threaded apertures. After appropriate coring, an insulated probe, the terminal member of the tap-off's inner conductor coupler, is screwed into one of the apertures to make electrical contact with the inner conductor of the cable. This probe has an associated impedance element. A second proble contacts the cable's outer braid; the third makes no conductive contact with the transmission cable, but serves as a connector of the outer braid of the branch line with the clamp.

Brady, also a coaxial coupler, is quite similar to Kamen. Although the defendant contends that Brady teaches partial piercing of the main line, the patent discloses only coring to within a few thousandths of an inch of the inner con-

---

**2.** 35 U.S.C.A. § 282 provides in part:
   "A patent shall be presumed valid. The burden of establishing invalidity of a patent shall rest on a party asserting it.
   \*   \*   \*"

ductor of the cable and insertion of an insulated probe. Conductive contact between the probe and the inner conductor of the cable is accomplished by pressure of a spring on the probe, which causes the remaining layer of dielectric to "flow" from the point of the probe. Brady uses this method so that only slight electrical discontinuity will occur at the connection point.

Bennett, a "Branch Line Connector," teaches, as described by the District Court, "a clamping device for reception of the main coaxial cable, which when screwed into place would cause metallic points to be driven into contact with the outer conductor, and would force another pin 'through the clamped cable outer conductor and inner dielectric between inner and outer conductors' to 'the point where the protruding pin point just makes firm contact with the main cable inner conductor.' A dielectric protrusion surrounding the pin shields it from contact with the main cable outer conductor. * * * Bennett does not have a conductive shell around the parts above the piercing contact pin, and hence the tap-off unit is not concentric. The whole unit is used in a terminal box, intended to eliminate radiation."

Eriksen teaches a device to attach the end of a coaxial cable to a junction box. The device is in two parts. One slips on to the end of the cable and, by wedging, separates the outer braid from the dielectric and inner conductor. The second part is then screwed into the first. The second has an inner conductor which contacts the inner conductor of the cable. Both parts have a metallic outer shell; the second also has a mechanically strong dielectric which separates and rigidly joins the threaded outer shell and inner conductor. In the engaged position the device maintains substantial coaxial configuration.

Weissmann, a "Tubular Conductor for Incandescent Electric Lamps," discloses, in the language of the District Court, "an outer tubular conductor insulated from an inner conductor which is 'preferably * * * a tube concentric with the outer tubular conductor.' Ordinary electric bulbs, with an extension or contact pin, in the base, are screwed into the outer conductor, the metal socket making contact with the outer conductor and the contact pin with the inner conductor. In one example, the contact pin is pointed, and as the light is screwed into the outer conductor, this point is forced through an insulating sheath surrounding the inner conductor to make contact therewith."

Boothby is a "frequency distinguishing device having low insertion loss." Again, borrowing the District Court's language, Boothby "shows a coaxial tap in which the probe engages the inner conductor of the coaxial cable after the dielectric has been removed to expose the central conductor. In Fig. 7 the probe is supported by a dielectric insert. The effect is exactly the same as if the dielectric had been cored, instead of being removed and replaced by a cored insert." Additionally, we note that attachment of the probe and dielectric insert to the cable is maintained by the screw-jack principle. There is no piercing, however.

Hall shows "socketless contact-making lamps provided with contact-making points of varying lengths, one to contact the upper conductor, and the other the lower conductor, of a pair of metal circuit producing elements, insulated from each other. * * * In one example, * * [t]he short uninsulated pin contacts the upper metal circuit producing element. The longer pin is, except for the piercing point, surrounded by insulating material."

More uses "the screw-jack principle to force the piercing pins of a branch connector into flat twin lines of a television transmission line." However, we note that piercing, which is slight, is effected, not in the manner of the plaintiff's long piercing pin, but rather by mashing, similar to the manner in which the short pins on plaintiff's clamp are forced into the cable when the clamp is bolted on.

Cork is a slot type connector for specially constructed coaxial cables. The device shows a condensor type imped-

**674**

ance element and an outer shell separated but joined to an inner conductor by a dielectric.

As the above discussion shows, every element of the plaintiff's patent can be found in the prior art, but no single reference completely anticipates it.

### Validity

■ The asserted invalidity of plaintiff's combination patent depends upon whether it was obvious to one possessing ordinary skill in the art to piece together the combination in the same way as plaintiff's assignors. Neither Congress nor the courts have formulated a more precise test. See O.M.I. Corporation of America v. Kelsh Instrument Co., 4 Cir., 1960, 279 F.2d 579, 584.

The defendant argues that he has met his burden, because all the elements of plaintiff's combination are old, the various elements of the combination work in the same way that they always had before, i. e., that they take on no "new functions" in the combination, and "the testimony of all the experts shows a lack of invention."

Although it is true that every element of the combination was old, and that Edlen and Diambra, the patentees, were not the first to design a coaxial tap-off device, the combination patent introduced a new way of effecting a high frequency tap and advanced the art by its disclosures. See Loom Co. v. Higgins, 1881, 105 U.S. 580, 591, 26 L.Ed. 1177; Black & Decker Mfg. Co. v. Baltimore Truck Tire Service Corp., 4 Cir., 1930, 40 F.2d 910, 912; Otto v. Koppers Co., 4 Cir., 1957, 246 F.2d 789, 800; Reiner v. I. Leon Co., 2 Cir., 1960, 285 F.2d 501, 503. The plaintiff's device can be easily and quickly installed without special tools or severing the transmission line. It effects a coupling of cables with a minimum amount of radiation and reflection losses, and it is relatively inexpensive to manufacture. The District Court, in recognition of these qualities, characterized the plaintiff's device as "compact, efficient and satisfactory," 186

F.Supp. at page 485, and as "clever and useful." Id., at page 499.

■ As to defendant's argument that the patent is invalid for want of "new functions," the District Court found as a fact that each element of plaintiff's combination "performs its ordinary and accustomed function in the way in which it always previously had done; * *." 186 F.Supp. at page 499. The testimony relied on by the District Court, however, makes clear that this finding means only that plaintiff's conductors conduct, that plaintiff's insulators insulate, and that plaintiff's impedance element impedes the flow of signal. Manifestly, this is not the standard for determining whether an element of a combination exhibits a "new function." The inquiry should more appropriately be directed to whether the elements of the combination perform or produce a new, different or additional function or operation, electrical or mechanical, in the combination than that theretofore performed or produced by them. See Lincoln Engineering Co. of Illinois v. Stewart-Warner Corp., 1938, 303 U.S. 545, 549, 58 S.Ct. 662, 82 L.Ed. 1008; Great Atlantic & Pacific Tea Co. v. Supermarket Equipment Corp., 1950, 340 U.S. 147, 151, 71 S.Ct. 127, 95 L.Ed. 162. The outer shell of plaintiff's second component does three things: it effects a conductive connection between the outer conductor of the main and the outer conductor of the branch lines, it prevents external radiation by dissipating the escaping signal along its surface, and it is shaped so that the application of a wrench to it will supply the piercing force to the insulated pin. Although the Holt tap shows the first two functions, Holt's outer shell is not used to obtain a mechanical advantage. In fact, no prior reference shows an outer shell with such function. Likewise, plaintiff's dielectric is used to transmit the piercing force, and this function cannot be found in the prior art. Consequently, the combination patent is not invalid for failure of its elements to demonstrate a "new function."

On the issue of obviousness, Judge Learned Hand has, perhaps, given the most articulate judicial expression:

> "The test laid down is indeed misty enough. It directs us to surmise what was the range of ingenuity of a person 'having ordinary skill' in an 'art' with which we are totally unfamiliar; and we do not see how such a standard can be applied at all except by recourse to the earlier work in the art, and to the general history of the means available at the time. To judge on our own that this or that new assemblage of old factors was, or was not, 'obvious' is to substitute our own ignorance for the acquaintance with the subject of those who were familiar with it. There are indeed some sign posts: e. g. how long did the need exist; how many tried to find the way; how long did the surrounding and accessory arts disclose the means; how immediately was the invention recognized as an answer by those who used the new variant?" Reiner v. I. Leon Co., 2 Cir., 1960, 285 F.2d 501, 503, 504.

These general principles have, for many years, guided the decisions of this circuit.

In *Otto v. Koppers Co.*, 4 Cir., 1957, 246 F.2d 789 our court reversed a finding of invalidity where skilled engineers in the art had failed to overcome the problems solved by the patent, and the invention had been adopted by the art. Also, the invention had enjoyed commercial success. Our decisions in *Manville Boiler Co. v. Columbia Boiler Co. of*

Pottstown, 4 Cir., 1959, 269 F.2d 600, 604 and *Honolulu Oil Corp. v. Shelby Poultry Co.*, 4 Cir., 1961, 293 F.2d 127 are to the same effect. Compare *O. M. I. Corp. of America v. Kelsh Instrument Co.*, 4 Cir., 1960, 279 F.2d 579, 584; *Brown v. Brock*, 4 Cir., 1957, 240 F.2d 723, 727; *S. H. Kress & Co. v. Aghnides*, 4 Cir., 1957, 246 F.2d 718, 723.

In the instant case the unobviousness of the plaintiff's combination is strongly evidenced by the failure of the contemporary workers, Kamen, Brady, Bennett, Holt and the defendant, to perceive the advantages of using the screw-jack and insulated piercing pin in direct combination, to pierce a coaxial cable. Although Weissmann saw the utility of a similar combination in 1914 in an accessory art, there is no indication that any one before plaintiff's assignors had tried to adapt the teachings of the Weissmann patent to effect a high frequency tap. In fact the evidence shows that government scientists during World War II searched but could not find a simple and inexpensive means to tap radar and radio coaxial transmission cables. It is of great significance that the patentees succeeded where learned scientists had failed. Also indicating unobviousness is the evidence that almost every manufacturer, including the defendant, of tap-off devices now markets a tap embodying the screw-jack and piercing pin idea. Lastly, we take note that the plaintiff's device has enjoyed commercial success, a factor which is entitled to weight in a close case.[3]

With the evidence in this state, we are compelled to conclude that the Dis-

3. As is not uncommon in patent litigation, defendant's witnesses testified that the device in question was but an obvious combination of old elements, while the plaintiff's experts were equally certain of the contrary. Pertinent here is the observation of Justice McKenna in *Diamond Rubber Co. v. Consolidated Rubber Tire Co.*, 1911, 220 U.S. 428, 435, 31 S.Ct. 444, 447, 55 L.Ed. 527:

"Knowledge after the event is always easy, and problems once solved pre-sent no difficulties, indeed, may be represented as never having had any, and expert witnesses may be brought forward to show that the new thing which seemed to have eluded the search of the world was always ready at hand and easy to be seen by a merely skillful attention. But the law has other tests of the invention than subtle conjectures of what might have been seen and yet was not."

trict Court erred in finding the patents invalid.[4]

However, the broad construction of its patent claims urged by the plaintiff with respect to its piercing unit cannot be allowed. It contends that the claim of an "insulated pin having an uninsulated point" includes a bare pin separated from the outer braid of the cable by air. We do not think the patent claims can be so interpreted. The phrase "insulated pin having an uninsulated point" obviously imports a difference between the surface of the pin at the point and its surface along the sides,[5] a difference not found on a bare pin.

In summary, the plaintiff's patent is valid, but, as to the piercing unit, the patent monopoly covers only an insulated pin with an uninsulated point distinct from, though attached to, a force-applying threaded outer shell, or something equivalent thereto.

## Infringement

The infringement charge is directed against the defendant's tap-off device, called 1451, first marketed about two years after the Fastee came on the market. It duplicates the Fastee in many respects: it has a clamp to hold the cable, with two short pins to pierce the outer insulation of the cable and make contact with the outer braid and with a threaded aperture into which is screwed a second component. This second component has an impedance element attached to its inner conductor and an outer threaded shell possessing both mechanical and electrical qualities. The inner and outer parts of the second component are rigidly separated (although not completely attached, since the 1451's impedance element is contained in a cavity provided for it in the dielectric) by a mechanically strong dielectric. The second component has a pin which is the terminal member of the tap-off's inner conductor and which, after the cable is cored by an appropriate tool through the outer braid of the cable, is forced the rest of the way into the cable by engaging and screwing the threads of the outer shell into the threads of the clamp aperture. Lastly, the outer shell, dielectric and inner conductor extend rearward to form a connector for the branch line.

There are, however, two differences between the plaintiff's and the defendant's devices: plaintiff insulates its piercing pin from the outer braid by covering it with insulation at the contact area, while the defendant insulates its pin from the outer braid by cutting the braid away, i. e., uses air. There is evidence that for a time the defendant used a spaghetti tube around its piercing pin which was squashed flat when the pin was screwed in, but this spaghetti cannot be considered insulation since, as pointed out by the District Court, the spaghetti is just as likely to bring the outer braid into contact with the pin as push it away from the pin. 186 F.Supp. at page 506. The second difference is closely related to the first. The plaintiff's insulated pin per-

---

4. We are fully advertent to the plaintiff's objections at the trial to the admission of testimony concerning 1401 and Holt, prior use devices, and the application for the Bennett patent, for lack of proper notice. The records show, however, as to 1401 and Holt that there was actual knowledge and that the District Judge offered the plaintiff adequate time and opportunity, if requested, to check the testimony and present countervailing testimony, if surprise were claimed, but plaintiff did not come forward with any such request. As to Bennett, notice of reliance on the patent was given, which sufficiently referred plaintiff to the applications. Plaintiff availed itself of the opportunity given by the court to submit objections and was heard thereon. We consider that the court thus fully complied with 35 U.S.C.A. § 282 by making appropriate terms governing admission of the challenged testimony. See Thermo King Corp. v. White's Trucking Service, 5 Cir., 1961, 292 F.2d 668.

These objections to the testimony need not be further considered here in light of our conclusion that the patents in suit, properly limited, are valid.

5. The plaintiff's argument about claims differentiation is adequately dealt with by the District Court. See 186 F.Supp. at pages 503–505.

mits piercing the cable without pretreatment. With defendant's device the cable must be partially cored to effect piercing to the inner conductor of the cable.

To establish infringement of its combination patent plaintiff must show that every essential element of the combination, or its equivalent, is embodied in the antagonist device. See Kay Patents Corp. v. Martin Supply Co., 4 Cir., 1953, 202 F.2d 47, 51; Sears, Roebuck & Co. v. Minnesota Mining & Mfg. Co., 4 Cir., 1957, 243 F.2d 136, 140; Johnson & Johnson v. Carolina Lee Knitting Co., 4 Cir., 1958, 258 F.2d 593, 597. This requirement is particularly applicable to the instant case since every element of the plaintiff's combination is shown in a prior patent, and it follows that if any essential element of the combination or its equivalent is omitted by the defendant, infringement is avoided. Compare Aro Mfg. Co. v. Convertible Top Replacement Co., 1961, 365 U.S. 336, 81 S.Ct. 599, 5 L.Ed.2d 592.

Equivalence is a question of fact. Its resolution requires consideration of "the purpose for which an ingredient is used in a patent, the qualities it has when combined with the other ingredients, and the function which it is intended to perform. An important factor is whether persons reasonably skilled in the art would have known of the interchangeability of an ingredient not contained in the patent with one that was." Graver Tank & Mfg. Co. v. Linde Air Products Co., 1950, 339 U.S. 605, 609, 70 S.Ct. 854, 857, 94 L.Ed 1097. "The theory on which it is founded is that 'if two devices do the same work in substantially the same way, and accomplish substantially the same result, they are the same, * * *.'" Id., 339 U.S. at page 608, 70 S. Ct. at page 856. Applying this reasoning to the instant facts we agree with the District Court's finding that there was no equivalence. The obvious purpose for which the plaintiff insulates its pin is to permit piercing of the cable without pretreatment. This is one of the significant improvements of the prior art by the plaintiff's device. The defendant pierces the cable in a substantially different way, i. e., partially cores the line. It is true that coring instead of insulating a probe to prevent shorting was a well known alternative at the time the defendant manufactured its device, but, since they are not "substantially" the same way, rather different ways, to pierce the cable, they are not equivalent.[6]

The plaintiff further argues that the defendant had pirated the "heart" of its patent, i. e., the screw-jack and piercing pin idea. We can only answer, "that there is no legally recognizable or protected 'essential' element, 'gist' or 'heart' of the invention in a combination patent." Aro Mfg. Co. v. Convertible Top Replacement Co., 1961, 365 U.S. 336, 345, 81 S.Ct. 599, 604, 5 L.Ed.2d 592.

Because of the difference between the piercing methods of plaintiff's and defendant's devices, we think the District Court's[7] finding of non-infringement is correct.

In conclusion, while we hold the patents valid, the defendant has not infringed, and the judgment in its favor is affirmed.

Affirmed in part and reversed in part.

---

**6.** Edlen in describing one of the desirable features of his invention said, "Getting down to fine points, I would think that very probably the device which Diambra and I invented had as one of its desirable features, the fact that no initial preparation of any sort had to be made to the cable."

**7.** The District Judge also found "that defendant's drilling of the outer conductor, while an essential concomitant of tis uninsulated piercing pin, was bona fide introduced in an effort to eliminate or materially reduce shunt capacitance believed to be associated with the piercing of the outer conductor by an insulated piercing pin (as distinguished from the coring of the outer conductor). The court further finds that the belief by defendant of the beneficial effects of coring the outer conductor was in good faith and was the reason for the adoption by defendant of a tap-off requiring coring; and that this was not simply a trick or subterfuge to avoid formal infringement."