HEYL AND PATTERSON, IN-
CORPORATED

v.

McDOWELL COMPANY, Incorporated,
and
Norfolk and Western Railway Company.
Civ. A. No. 2795.

United States District Court
E. D. Virginia,
Richmond Division.

Nov. 15, 1961.

———◆———

Bowles, Boyd & Herod, Jack N. Herod, Richmond, Va., for plaintiff.

Williams, Mullen, Pollard & Rogers, Fielding L. Williams, Richmond, Va., Justin W. Macklin, Cleveland, Ohio, for defendants.

LEWIS, District Judge.

The plaintiff filed this action against the defendants for infringement of its

patent (U. S. Patent #2651423), and other relief.

The plaintiff alleges that during the Fall of 1949, it redesigned and modernized a coal loading apparatus for Rail to Water and thereafter, to-wit, February 2, 1951, applied for and received, to-wit, September 8, 1953, U. S. Patent #2651423, titled "Apparatus for loading Bulk Material Into a Ship's Hold".

The plaintiff further alleges that the defendant, Virginian Railway Company, with full knowledge of the foregoing construction for Rail to Water and of the said patent, willfully solicited bids for the erection of an apparatus for loading bulk material into a ship's hold at its Sewalls Point pier, specifically describing the loading apparatus covered by the plaintiff's patent; that in response thereto, the defendant, McDowell Company, Incorporated, submitted its bid to supply the Virginian Railway Corporation the apparatus, said apparatus being functionally identical with the apparatus shown in the drawings of said patent and also with the apparatus constructed by plaintiff for Rail to Water; that said defendants were formally notified of plaintiff's patent, nevertheless, they proceeded to construct the said apparatus; that defendant, McDowell Company, Incorporated, has infringed plaintiff's patent by selling said loading apparatus, and that the defendants, McDowell Company and Virginian Railway, jointly and severally, are presently in process of infringing plaintiff's patent by making said loading apparatus and threaten further to infringe plaintiff's said patent by completing and using said loading apparatus, all to the irreparable loss, damage and injury of the plaintiff.

Both defendants answered, denying the validity of the patent in question and the infringement complained of, and filed a counterclaim, asserting among other things, that the plaintiff is informing the trade without reasonable cause or justification, that the defendant is willfully infringing the patent in suit; that the plaintiff is so informing the trade for the purpose of prejudicing potential customers against defendant, McDowell; and that the plaintiff is misusing its patent in suit by representing in the trade that it broadly covers coal handling apparatus of the general nature, which for many years Wellman Engineering Company has been bidding upon and constructing, all to the damage of the defendants.

Loading coal and/or other bulk material into the hold of a ship with minimum degradation has plagued the transportation industry for many years, resulting in numerous patents being applied for and granted.

The prior art discloses that Stuart (Patent Nos. 1241053 and 1339486) provided for a variable speed conveyor which may be controlled from any suitable place, and means for delivering bulk material into the hold of a ship, such means being either a lowerator or chute to minimize degradation; MacLennon (Patent No. 1331020) provided for a stationary hopper which feeds the bulk material to a swingably-mounted and telescopic chute.

Scott (Patent No. 1325704), Adams (Patent No. 1752410), Weigert (Patent No. 1852385) and Jones (Patent No. 2215736) all granted prior to 1941, contributed much to the prior art of loading bulk material into the hold of a ship with minimum degradation, all of which were cited by the examiner in denying the original claims of the patent in suit.

The Howland Hook coal loading apparatus, in use by the Baltimore and Ohio Railroad at its Baltimore pier, prior to 1949, was an assembly of various elements known in the prior art and similar to that of the patent in suit, with minor exceptions hereinafter more fully discussed, principally, no surge capacity to control the level of the coal in the chute.

In the Fall of 1949, the plaintiff re-designed and modernized the coal loading apparatus of Rail to Water, the result of this work being the subject of the original application of the patent in suit.

1. "We claim:

"1. A method of loading a ship's hold or the like with bulk material including frangible lumps, comprising the steps of continuously delivering the material into the upper end of a loading chute while releasing the material from the lower end of the chute and regulating the relationship of the amount delivered to the amount released to keep the chute substantially full during passage of the material through the chute.

"2. A method of loading a ship's hold or the like with bulk material including frangible lumps, comprising the steps of continuously delivering the material into the upper end of a loading chute while releasing the material from the lower end of the chute and regulating the rate of delivery into the chute to keep the chute substantially full during passage of the material through the chute.

"3. A method of loading a ship's hold or the like with bulk material including frangible lumps, comprising the steps of delivering the material from a traveling belt into the upper end of a loading chute while releasing the material from the lower end of the chute and regulating the speed of the belt to keep the chute substantially full of the material.

"4. Apparatus for loading bulk material into a ship's hold or the like, comprising a downwardly extending loading chute having a substantially unobstructed passage therethrough, an adjustable gate controlling the outlet at the lower end of the passage, delivery means including a

The inventors claim to have invented certain new and useful improvements in * * * "Material Loader and Loading". They set forth five claims,[1] all of which were rejected by the examiner[2]

delivery belt having its discharge end disposed adjacent the upper end of said passage to discharge material from the belt into the upper end of said passage, and a variable speed drive for said belt, whereby the belt and chute deliver bulk material into a ship's hold or the like without a free fall through the chute by regulation of said drive to keep the chute substantially full of material while the gate releases desired quantities of the material at the lower end of the chute.

"5. Apparatus for loading bulk material in the form of frangible lumps into a ship's hold or the like, comprising a downwardly extending loading chute having a substantially unobstructed passage therethrough, an adjustable gate controlling the outlet at the lower end of the passage, delivery means including a delivery belt having its discharge end disposed adjacent the upper end of said passage to discharge material from the belt into the upper end of said passage, a variable speed drive for said belt, a hopper for receiving and releasing said material, and means to release material from the hopper to the delivery means to form a continuous layer of a predetermined depth on the delivery belt, whereby the belt and chute deliver bulk material from the hopper into a ship's hold or the like without a free fall through the chute by regulation of said drive to keep the chute substantially full of material while the gate releases desired quantities of the material at the lower end of the chute."

2. "References applied:

| | | | |
|---|---|---|---|
| Scott | 1,325,704 | Dec. 23, 1919 | 198/76x |
| Adams | 1,752,410 | April 1, 1930 | 214/14 |
| Weigert | 1,852,385 | April 5, 1932 | 214/14x |
| Jones | 2,215,736 | Sep. 24, 1940 | 214/14 |

"Claims 1 to 3 are rejected as improper method claims in that the steps recited are no more than those followed in the normal and intended use of applicant's apparatus.

"Claims 1 to 3 are further rejected as covering the steps followed in the ordinary use of Weigert's loading apparatus.

"Claims 4 and 5 are rejected as unpatentable over Weigert in view of Scott and either Jones or Adams. The primary reference discloses apparatus for loading

bulk material in a vessel. This apparatus includes conveyor belts 8, 6, hopper 29, telescopic chute 11, and means at the chute's lower end to regulate the discharge of material. The material is kept at a predetermined height in the chute and hopper. A switch 43 is actuated to stop or start the feeding belt conveyor when the material exceeds or falls below a set level. No invention is seen in operating Weigert's conveyor at a variable speed to obtain a continuity of flow as

as being unpatentable in view of the prior art. Thereafter, Claim No. 1 was cancelled and Claims Nos. 4 and 5 were amended by providing for a swingably supported delivery means with the upper end of the chute being of substantially enlarged cross section relative to the minimum cross section along the lower end. These amended claims were likewise rejected by the examiner,[3] in view of Weigert.

Thereafter the title of the patent was changed to—"Apparatus for loading bulk material into a ship's hold.—"

All of the original claims were cancelled and a single new claim (No. 6) substituted.[4] This new claim was

this teaching is obtained from Scott. Nor would there be any invention in substituting for Weigert's chute discharge control means, the chute discharge gate of either Jones or Adams.

"Claims 4 and 5 are further rejected on Adams in view of Scott. No invention is seen in filling Adam's hopper 5 with loose material by means of a variable speed conveyor belt as shown by Scott."

3. "Responsive to amendment filed May 15, 1952.

"Patent of Interest:

"French Patent 806,266

Dec. 11, 1936 214/17C

(1 sht. drwg.; 3pp. spec.)

"Claims 2 and 3 are rejected as unpatentable over Weigert who discloses that it is well known to have a vertical loading chute substantially filled at all times to prevent the degradation of frangible material being fed thereto from above while at the same time material is discharged from the bottom of the chute. In view of such desirability to have the chute substantially filled, it would involve no unobvious step to vary the speed of the conveyor 9 to accomplish this result because such a step would be within the knowledge of a skilled mechanic.

"Claims 4 and 5 are rejected as unpatentable over Weigert. As was stated in the rejection of claim 1, it is obviously well known that to keep a loading chute substantially filled will prevent degradation of frangible material. This Weigert accomplishes by automatic electrical controls. It appears obvious from such teachings that a human observer can manually control the feeding and discharge means of the chute to achieve the same end result in lieu of automatically actuated electrical switches. To control the feed by varying the speed of the charging belt 9 instead of a zero and normal speed conveyor disclosed is an obvious alternative control productive of no unexpected result. Applicant's interpretation of lines 4–9, page 3 of Weigert does not appear correct. Said lines do not refer to any maximum or minimum level, but merely state that in setting the conveyor to operate above a given height, upward creep of the material cannot be prevented. However, switch 43 will prevent overflow. It would be a mere substitution of equivalents to replace Weigert's controlled chute bottom discharge means by a manually controlled gate which gate applicant admits is known in the art. No source of supply is shown by Weigert but it is stated that material could be received from a pocket which is obviously the equivalent of a hopper.

"This action is made *final*.

"No claim is allowed."

4. "6. Apparatus for loading bulk material into a ship's hold or the like comprising a supporting structure, generally upright hollow delivery means through which bulk material being loaded passes downwardly, the delivery means having an open upper end, the delivery means being swingably supported by the supporting structure with its open upper end disposed below the top of the supporting structure, the delivery means having a discharge opening at its lower end, an adjustable control gate for the discharge opening controlling the rate of passage of bulk material out of the bottom of the delivery means, a conveyor for conveying bulk material into the open upper end of the delivery means, a variable speed drive for the conveyor, the portion of the delivery means at and for a substantial distance downwardly from the open upper end thereof being of relatively very great transverse cross-section as compared with the maximum transverse cross-section of the discharge opening and tapering to smaller cross-section toward the discharge opening so that bulk material filling the delivery means moves downwardly very slowly at the transversely enlarged upper portion thereof as compared with the rate of passage of the bulk material out of the bottom of the delivery means, an operating station on the supporting structure positioned to afford an operator at the station an unobstructed view down into the transversely enlarged open upper end of the delivery means and control means for the variable speed conveyor drive, the control means

further amended by Sub-Claims Nos. 7 and 8, with the following remarks: "Each of claims 7 and 8 contains all of the limitations of claim 6 and additionally is narrower than claim 6 so we believe that the new claims will be found allowable."

The patent in suit was then granted.

The defendants seriously contend that the patent as granted is invalid and that this Court should so declare. They claim it lacks novelty and invention, as defined by the statutes and the courts; that all of the claims include, in the claimed assemblages, old elements that perform or produce no new or different function or operation than they did in the prior art; the claims, therefore, are invalid for claiming an unpatentable aggregation of old elements under Lincoln Engineering Co. of Illinois v. Stewart-Warner, 303 U. S. 545, 58 S.Ct. 662, 82 L.Ed. 1008. With this the Court would not disagree, if the patent in suit encompassed all of the broad claims which were rejected by the examiner, but such was not the case.

The patent in suit is limited to the confines of substituted claim #6, as amended.

■■ The patent, as granted, is presumed valid. The burden of establishing invalidity shall be on the party asserting it. 35 U.S.C.A. § 282. The prior art, not cited by the examiner, no doubt weakens this presumption, but it is not sufficient to overcome it.

"The asserted invalidity of plaintiff's combination patent depends upon whether it was obvious to one possessing ordinary skill in the art to piece together the combination in the same way as plaintiff's assignors. Neither Congress nor the courts have formulated a more precise test. See O.M.I. Corporation of America v. Kelsh Instrument Co., 4 Cir., 279 F.2d 579." (Quoted from Entron of Maryland, Inc. v. Jerrold Electronics Corp., No. 8302, U. S. Court of Appeals for the Fourth Circuit, decided October 13, 1961, 295 F. 2d 670.)

The defendant argues that it has met its burden because all the elements of plaintiff's combination are old, the various elements of the combination work in the same way that they always had before, i. e., that they take on no new functions in the combination.

■ Although it is true that every element of the combination was old, and that the patentees were not the first to design an apparatus for loading bulk material into a ship's hold, the combination patent introduced a new way of effecting such loading with minimum degradation and one that was relatively inexpensive to construct. (See Entron of Maryland, Inc. v. Jerrold Electronics Corporation, No. 8302, U. S. Court of Appeals for the Fourth Circuit, decided October 13, 1961, 295 F.2d 670, and cases cited therein.)[5]

The patent in suit covered an assemblage of old elements which permitted the operator to visually observe and maintain a constant level of coal in the enlarged open upper end of the delivery chute, thereby reducing the drop of the coal from the belt, thus minimizing degradation. This was accomplished by the operator manually controlling the variable speed of the belt system so as to maintain a solid column of coal in the ship loading chute.

■ Therefore, this combination patent is not invalid for failure of its elements to demonstrate a new function.

being disposed at the operating station enabling the operator while watching the relatively very slow downward movement of the bulk material at the transversely enlarged upper portion of the delivery means to operate the control means to control the speed of the conveyor and thereby maintain approximately constant the level of bulk material in the delivery means and avoid degradation of the bulk material which might occur due to its falling freely.—."

5. Loom Co. v. Higgins, 105 U.S. 580, 26 L.Ed. 1177; Black & Decker Mfg. Co. v. Baltimore Truck Tire Service Corp., 4 Cir., 40 F.2d 910; Otto v. Koppers Co., 4 Cir., 246 F.2d 789; Reiner v. I. Leon Co., 2 Cir., 285 F.2d 501.

On the issue of obviousness, Judge Learned Hand has, perhaps, given the most articulate judicial expression:

"The test laid down is indeed misty enough. It directs us to surmise what was the range of ingenuity of a person 'having ordinary skill' in an 'art' with which we are totally unfamiliar; and we do not see how such a standard can be applied at all except by recourse to the earlier work in the art, and to the general history of the means available at the time. To judge on our own that this or that new assemblage of old factors was, or was not, 'obvious' is to substitute our own ignorance for the acquaintance with the subject of those who were familiar with it. There are indeed some sign posts: e. g. how long did the need exist; how many tried to find the way; how long did the surrounding and accessory arts disclose the means; how immediately was the invention recognized as an answer by those who used the variant?" Reiner v. I. Leon Co., 2 Cir., 285 F.2d 501.

These principles have, for many years, guided the decisions of the United States Court of Appeals for the Fourth Circuit, which this Court is duty bound to follow. Entron of Maryland, Inc. v. Jerrold Electronics Corp., supra.

Therefore, the Court is of the opinion the patent in suit (limited in the manner above cited) is valid and so declares.

In support of its claim of infringement, the plaintiff contends the evidence establishes (1) that the defendants have wilfully and deliberately copied and appropriated the invention of the patent in suit, and (2) that defendants have compounded the offense by a studied course of procedure intended to obstruct the plaintiff and to mislead the courts. With this we do not agree.

The facts, as found by the Court, disclose that the defendant, Virginian Railway Corporation, was in need of rebuilding and modernizing its existing coal loading facility at Sewalls Point and that pursuant thereto its engineers prepared a sketch showing its existing facilities, together with proposed improvements and invited suggestions from numerous firms, including the plaintiff corporation; that in response thereto a representative of plaintiff visited with the officials of the Virginian Railway Corporation, in Norfolk, and made several suggestions to its engineers. This representative explained the new Rail to Water installation and showed moving pictures thereof. Some time thereafter the Virginian Railway Corporation solicited bids for the construction of its proposed coal loading facility. Several firms responded, including the plaintiff corporation, with the bid of the Wellman Engineering Company being accepted.

It is true the plans for the modernizing of the Virginian's coal loading facility included all of the elements of the combination [6] found in the Rail to Water installation. However, none of these elements were either new or novel (the inventor readily so admitted during the trial). It is likewise true the general arrangement of these old elements, with the exception of necessary variations to tie in with the existing Virginian coal loading apparatus, were similar with Rail to Water. This general arrangement was likewise similar to the Howland Hook coal loading apparatus in use by the Baltimore and Ohio Railroad.

But such is not the determinative question. It is not infringement to utilize and/or copy that which is known in the art not then covered by existing patents. The inventor admits the individual components of the defendant's apparatus are not covered by his invention. The "idea" of putting them all together to accomplish an end result is the basis of his claim of infringement. The pertinent portion of the inventor's testimony is copied verbatim in the footnote.[7]

6. Variable speed conveyors, chutes, hopper, trimmer, rotary dumper, etc.

7. "By the Court:
"Q. Mr. Rose, in your own words, what are the exclusive features that

The attorney for the plaintiff stated the subject matter of the patent in suit to be as follows: "The coal is delivered upon a series of conveyors from a starting point not shown in this figure, (Plaintiff's Exhibit 130), on to a final conveyor which delivers it into the upper end of a delivery means. The delivery means is designated 14, the upper section is 15 and the lower section 17. The delivery means is swingably mounted upon the supporting structure upon a pivot 16, * * * and the entire delivery means in that drawing of the patent is swingably mounted. * * *. The upper end of the delivery means is highly enlarged, as the drawing shows. The belt system which delivers the coal into the enlarged open upper end of the delivery means is a variable speed belt system. The speed of the belt system is controlled by a control means in the operator's cab 46, which, as clearly shown on the drawing, is positioned so that the operator can look down into the enlarged open upper end of the delivery means. At the bottom of the delivery means is a gate 20. That gate is controlled to maintain a solid column of coal in the delivery means, the gate being used to allow coal to be discharged from the bottom of the delivery means in accordance with the conditions existing in the hold of the ship, * * *, when the hold is topped off the coal is delivered more slowly. That is controlled by gate 20 at the bottom of the delivery means. Now the operator in the cab 46, during the delivery of coal on the variable-speed belt system into the upper end of the delivery means, controls the speed of the belt system so as to maintain the level of the coal in the upper portion of the delivery means, reducing the drop of the coal from the belt into the upper end of the delivery means and thereby minimizing degradation of the coal."

Thus, the patented "idea" of the plaintiff's apparatus is, the specific arrangement of the old elements therein, namely, a delivery means, consisting of variable speed delivery belts and a swingably supported loading chute, with the upper end thereof very greatly enlarged, to accommodate a large surge capacity, and an operator's cab which must be positioned to afford an unobstructed view down into the enlarged upper end of the chute, in order to enable the operator to manipulate the manual controls while thus observing the coal, thereby permitting

your apparatus has compared to all other in existence at that time? What do you contend the exclusive features are?

"A. It is the combination of that group of pieces of equipment. If I may outline them, the dumper, the hopper for receiving the coal, the system of conveyors, the variable speed operated from a control means in the cab so situated that the operator could look down in the upper end of the delivery means and observe the coal level so that it could be maintained at that spot as the coal was allowed to pass out the bottom, out of gate 20. That particular combination of units I have seen nowhere else except in the patent in suit.

"Q. Now, do I understand, then, basically—I am not trying to get you to say anything that is not correct; it is only for information—basically, yours is the combination of units, as distinguished from any one or more of the component parts? It is the combination of them that makes it exclusive?

"A. It is the combination that makes it work—it is that particular combination that makes it work.

"Q. And you do not contend, or do you contend, that any of the individual units in and of themselves is' exclusive?

"A. Well, when you say 'unit'—

"Q. When I speak of a unit I am talking about the variable belt, or the mouth of the chute, that is, by the large opening, or after the chute is constructed, or the gate at the bottom—tippler, I believe you called it.

"A. I can say this: that you can find on the prior art those individual pieces of apparatus.

"Q. That is what I am getting at. You concede that the prior art has all of the combination?

"A. Has all of the combination.'

"Q. It is your idea that putting them all together to accomplish an end result is what you contend. is really the basis of your claim?

"A. That is correct.

"The Court: That is all. I just wanted to get your position, since you are the inventor."

him to maintain a solid column of coal in the delivery means for the purpose of minimizing degradation.

Therefore, it is necessary to determine from the facts in this case whether or not the arrangement of the old elements in the defendant's apparatus is either identical or sufficiently similar, with the arrangement encompassed by the patent in suit to constitute infringement.

■ "To establish infringement of its combination patent, plaintiff must show that every essential element of the combination, or its equivalent, is embodied in the antagonist device. See Kay Patents Corp. v. Martin Supply Co., 4 Cir., 1953, 202 F.2d 47, 51; Sears, Roebuck & Co. v. Minnesota Mining & Mfg. Co., 4 Cir., 1957, 243 F.2d 136, 140; Johnson & Johnson v. Carolina Lee Knitting Co., 4 Cir., 1958, 258 F.2d 593, 597. This requirement is particularly applicable to the instant case since every element of the plaintiff's combination is shown in a prior patent, and it follows that if any essential element of the combination or its equivalent is omitted by the defendant, infringement is avoided. Compare Aro Mfg. Co. v. Convertible Top Replacement Co., 365 U.S. 336, 81 S.Ct. 599, 5 L.Ed.2d 592." The above quotations were taken from Entron of Maryland, Inc. v. Jerrold Electronics Corp., supra.

The plaintiff frankly concedes the offending apparatus does not read exactly with the specifications of substituted claim #6. It bases its claim of infringement primarily upon the doctrine of equivalents and contends: (1) the stationary hopper or surge bin of defendant's apparatus, together with the swingably-supported chute, is the equivalent of the swingably-supported delivery means with an enlarged upper opening called for in the patent in suit, and that its function is the same; (2) the indicator or dial in the operator's cab is the equivalent of having the cab positioned so the operator could observe the height of the coal in the upper end of the delivery means; and (3) the master switch,

Tracerlab equipment and lockable switch arrangement for controlling the speed of the belts was the equivalent of the manual control provided for in the claim of the patent in suit.

■ Equivalence is a question of fact.

"The theory on which it is founded is that 'if two devices do the same work in substantially the same way, and accomplish substantially the same result, they are the same, * * *.' " See Graver Tank & Mfg. Co. v. Linde Air Products Co., 339 U.S. 605, 70 S.Ct. 854, 94 L.Ed. 1097; also Entron of Maryland, Inc. v. Jerrold Electronics Corp., supra.

The defendant's stationary hopper was primarily designed and used to hold the surplus coal from the belts when the apparatus was being moved inshore. Further, this hopper was not attached to, or made a part of, the swingably-supported delivery means called for in the patent in suit. The requirements of the defendant's apparatus necessitated a moving tower incapable of supporting either the weight or bulk of that type of delivery means.

The original location of the operator's cab on the defendant's apparatus was above the open upper end of the stationary hopper prior to the completion of the structure. However, it was subsequently relocated considerably below the open upper end of the hopper in order to give the operator a better view of the deck of the ship being loaded.

The plaintiff contends the relocation of the operator's cab during construction is of itself material evidence of infringement. We do not agree.

The evidence, although in conflict, does not support the plaintiff's contention that the cab in question was originally located for the purpose of providing the operator an unobstructed view into the open upper end of the stationary hopper so as to permit him to control the level of the coal therein, or that the cab was relocated to avoid infringement. Such a view was

never obtainable from the original location of the cab.

The plaintiff further contends the attempt at automation on the part of the defendant was an afterthought, devised to avoid infringement and that in any event the conveyor belts could be and were operated manually.

The plans for defendant's apparatus called for control switches, on the hopper or surge bin, to automatically start and stop the belts when the level of the coal in the bins reached certain limits. The apparatus, when completed in an operative condition, had a complex belt control system employing atomic radiation sources and a radiation receiver and electronic controls responsive thereto for automatically regulating the speeds of the conveyors. It was subject to starting and stopping from the operator's cab by means of a master switch. The system included as an essential component for calibrating and testing purposes, a meter comprising a dial and a pivoted needle which responds to radiation count.

The Court finds from the evidence that this dial was not designed or used or capable of being used for the purpose of maintaining a constant level of coal in either the stationary hopper or chute, or both, and that the speed of the belts, as well as the starting and stopping thereof, were primarily automatically controlled as distinguished from manual control.

Therefore, all of the elements of the combination patent in suit are not present in the defendant's apparatus, either in fact or under the doctrine of equivalents.

██ This "doctrine of equivalents", although well established in patent law, is applicable only under certain conditions, which do not exist in this case. The original broad claims of the patent in suit were rejected by the examiner and subsequently cancelled by the patentee. He can not thereafter incorporate them in the granted patent via equivalents.

"Whether the examiner was right or wrong in rejecting the original claim, the court is not to inquire. Hubbell v. United States, supra [179 U.S.] [77] 83 [21 S.Ct. 24, 45 L.Ed. 95]. The applicant having limited his claim by amendment and accepted a patent, brings himself within the rules that if the claim to a combination be restricted to specified elements, all must be regarded as material, and that limitations imposed by the inventor, especially such as were introduced into an application after it had been persistently rejected, must be strictly construed against the inventor and looked upon as disclaimers." Smith v. Magic City Kennel Club, 282 U.S. 784, 51 S.Ct. 291, 75 L.Ed. 707.

Again, in Exhibit Supply Company v. Ace Patents Corp., 315 U.S. 126, 62 S.Ct. 513, 86 L.Ed. 736, the Supreme Court held:

"We do not find it necessary to resolve these contentions here. Whatever may be the appropriate scope and application of the doctrine of equivalents, where a claim is allowed without a restrictive amendment, it has long been settled that recourse may not be had to that doctrine to recapture claims which the patentee has surrendered by amendment."

A careful examination of the "file wrapper" of the patent in suit, clearly indicates the patentee gave up the broad claims asserted in original claims numbered 1 thru 5, in order to avoid the examiner's rejections.

██ "File wrapper estoppel" bars recourse to the doctrine of equivalents in cases where the patentee attempts to secure through equivalents what has been rejected by the Patent Office. See Chief Judge Sobeloff's lucid opinion covering this subject in Carter Products, Inc. v. Colgate Palmolive Co., 4 Cir., 269 F.2d 299.

██ In conclusion, the Court holds the patent in suit, limited by substituted claim #6, as amended, is valid and the defendants have not infringed. The

counterclaim of the defendants, not being sufficiently supported by the evidence, is dismissed.

Counsel for the defendants will prepare an appropriate order in accordance with this memorandum opinion, submit the same to counsel for the plaintiff for approval as to form, and the same will be entered accordingly.