**WAYNE KNITTING MILLS and the May Corporation, Plaintiffs,**

v.

**RUSSELL HOSIERY MILLS, INC., and Paul Russell, President, Defendants.**

**No. C–183–R–65.**

United States District Court
M. D. North Carolina,
Rockingham Division.

Sept. 29, 1967.

Joseph W. Grier, Jr., of Grier, Parker, Poe & Thompson, Charlotte, N. C., David H. Semmes, of Semmes & Semmes, Washington, D. C., and Charles B. Park, III, of Parrott Bell, Seltzer, Park & Heard, Charlotte, N. C., for plaintiffs.

Welch Jordan, of Jordan, Wright, Henson & Nichols, Greensboro, N. C., and Charles R. Fenwick and Thomas B. Van Poole, Jr., of Mason, Fenwick & Lawrence, Washington, D. C., for defendants.

## MEMORANDUM OPINION

GORDON, District Judge.

This is an action for infringement of Claim 3 of the Sarbo patent (United States Letters Patent No. 3,059,458, issued October 23, 1962) relating to knitted shoe-top-length foot covers or socks. The plaintiffs initially alleged both patent infringement and unfair competition against the corporate defendant. After discovery ensued, the unfair competition charge was withdrawn. The action is now solely for patent infringement against the defendant, Russell Hosiery Mills, Inc., and against the defendant, Paul Russell, President of Russell Hosiery Mills, Inc., for actively inducing others to infringe the Sarbo patent by manufacturing and selling shoe-top-length foot covers.

The product which is the subject of the patent in suit is a knitted article of ladies' footwear designed to be worn on the foot without showing above the top of the shoe, to give the "bare-legged" look when worn, as it customarily is, without conventional socks or hosiery. Footwear of this type has been called footcovers, shoe-top-length foot socks, footees, liners, peds, and footlets.

It is contended by the defendants that Claim 3 of the Sarbo patent is invalid

for lack of invention; for want of invention over the state of the prior art as described in patents and publications before the Sarbo invention or discovery or granted or published more than one year prior to the filing date of the application for the Sarbo patent; for want of adequate and sufficient disclosure in the specification and drawings thereof; and because Claim 3 is vague and indefinite and inherently incapable of particularly pointing out and distinctly claiming an invention over the prior art as required by 35 U.S.C.A. § 112. In the alternative, even if Claim 3 is determined to be valid, the defendants deny that they infringed the claim.

Claims 1 and 2 of the patent are not alleged to have been infringed, and only the footcovers produced by the defendant, Russell Hosiery Mills, Inc., under the designations Style 1334 A and Style 1334 C are alleged to infringe Claim 3 of the Sarbo patent.

The case was heard on the issues of validity, infringement, and inducement of infringement by the individual defendant. The issue of damages was deferred.

Having now carefully considered all of counsels' proposals, arguments, and contentions, as well as the testimony, pleadings, stipulations, briefs, and exhibits submitted, and the reasonable inferences to be drawn therefrom, the Court pursuant to Rule 52 of the Federal Rules of Civil Procedure makes its Findings of Fact and Conclusions of Law as follows:

### FINDINGS OF FACT

1. Plaintiff, Wayne Knitting Mills, a corporation, is the owner of the U. S. Letters Patent No. 3,059,458, granted October 23, 1962, to Edgar G. Sarbo, a United States citizen, who resided in Vienna, Austria, on October 23, 1962. Plaintiff, Wayne Knitting Mills, became the owner of the Sarbo patent through various assignments, and is actively engaged in the manufacture of shoe-top-length foot covers.

2. Until about July 5, 1965, plaintiff, The May Corporation, was known as May Hosiery Mills. On or about July 5, 1965, plaintiff, Wayne Knitting Mills, acquired all of the assets of May Hosiery Mills, including the patent in suit, and the name of May Hosiery Mills was changed to The May Corporation.

3. The Sarbo patent was issued on an application having an actual filing date of November 12, 1959, and an effective filing date, under the International Convention, of November 19, 1958. The patent in suit, No. 3,059,458, named Edgar G. Sarbo, of Vienna, Austria, as the inventor and while the application was pending in the U. S. Patent Office the patent rights were assigned by Edgar G. Sarbo to Bruder Sarbo, also of Vienna, Austria. On or about December 3, 1964, the patent was assigned by Bruder Sarbo to Renfro Hosiery Mills Company, a North Carolina corporation, and on or about January 26, 1965, was assigned by Renfro to May Hosiery Mills pursuant to an agreement of December 22, 1964. The patent was then assigned by May Hosiery Mills to the plaintiff, Wayne Knitting Mills, on July 3, 1965.

4. Prior to Sarbo's method and product in 1958, shoe-top-length foot socks were available in the market but were made either from flat knitted fabric,[1] which was then cut and sewn into the desired shape and provided with a sewn-in elastic rim around the foot entry opening or knitted as a regular sock, having reciprocated heel and toe pockets which would then be cut down at the top and provided with a sewn-in elastic rim around the foot entry opening. The defendant, Russell Hosiery Mills, Inc., was making a cut and sewn shoe-top-length sock at the time it began making the Sarbo type sock in July, 1964. These shoe-top-length foot socks were not only comparatively expensive to manufacture due to the fact that cutting and sewing had to be performed but also were rather

---

1. As distinguished from tubular seamless fabric as in the Sarbo sock.

uncomfortable by reason of the fact that they were provided with a heavy band or rim of elastic sewn around the foot opening which tended to burrow into the foot of the wearer due to the pressure of the shoe. Cutting and sewing is a time consuming operation requiring skilled operators and entailing considerable waste.

5. The sock of the Sarbo invention is a symmetrical pouch-like sock which is reversible from heel to toe. It is made from a seamless stretch tube of knitted fabric closed across the bottom with a stretchable seam and provided with some rubber threads in the top to form an elastic rim. The courses of the Sarbo sock run longitudinally of the foot rather than transversely of the foot as is the case with a conventional hosiery product. In summary, the finished product consists simply of a short length of circular knit, seamless, tubular fabric, similar to that employed in making the top and upper leg portion of seamless hosiery, having several courses of rubber laid in at what is to become the top of the foot cover, followed by a number of courses of plain knit fabric, both of which are knitted on conventional, circular knitting machines in a manner similar to conventional knitting of seamless hosiery. In practice, the sock of the Sarbo invention is knitted of stretch yarn, so as to have the capacity to stretch about a wide variety of foot sizes and conform to the lower portion of the foot which normally lies within the shoe.[2]

6. The only claim of the Sarbo patent charged to be infringed is Claim 3, which is directed to the ultimate foot cover product.[3] This claim is directed to a combination of elements forming a knitted foot cover. The sock of the Sarbo invention can be made on practically any type of circular hosiery machine and can be closed along the bottom by a conventional looping operation or seamed with a straight machine seam by relatively unskilled personnel. The sock does not require boarding or other shaping operation prior to marketing.

7. Sarbo began manufacturing and selling his shoe-top-length socks of the type described in the Sarbo patent in Austria and on November 19, 1958, filed an application for patent in Austria. On November 12, 1959, Sarbo filed a corresponding application in the United States which eventually matured into the patent in suit, issued October 23, 1962. Having filed his application for a patent in the United States pursuant to the provisions of an International Agreement,[4] the Sarbo United States patent is entitled to the benefit of the November 19, 1958, application filing date, which date is the date that the application for patent was filed in Austria.

8. In addition to obtaining patents on the shoe-top-length foot socks in Austria and the United States, Sarbo also obtained patents on the socks in Argentina, Belgium, Canada, Denmark, Finland, France, Germany, Great Britain, Greece, Italy, Luxemburg, Norway, Spain, Sweden, and Switzerland, and has licensed his patent rights in Germany, Spain, and Switzerland.

9. As early as 1959, and without any knowledge of the Sarbo patent or of any foot socks made thereunder, the plaintiff, The May Corporation, then known as May Hosiery Mills, sought

---

2. The evidence shows that the Sarbo sock is often worn within extremely low cut shoes such as ladies' high heel slippers.

3. Claim 3 is as follows:
"3. A knitted foot cover comprising a seamless tubular rim including at least some rubber threads,
said rim being adapted to form an opening for a foot entry, a seamless tubular body having an axial length greater than that of said rim and connected with said rim, said rim and said body, each, respec-

tively, consisting of the same knitting structure throughout its entire axial length and throughout its entire periphery, and a seam formed at the end of said body opposite said rim, to form a symmetrical pouch-like body, and said body being adapted to function as tip, sole and heel portions of said foot cover.

4. Convention of the Union of Paris of March 20, 1883, for the protection of industrial property, ratified by the United States as of May 30, 1887.

to improve the objectionable features of their shoe-top-length foot socks then on the market. The employee of May Hosiery Mills charged with the responsibility for developing the sock was C. T. Smith. Smith's instructions were to develop a circular knit shoe-top-length foot sock which would not require cutting and sewing and in which it would not be necessary to use a sewn-in rubber band to hold it up. Smith did develop a sock containing an extended gore requiring some reciprocatory knitting to shape the sock. Circular knit fabrics having reciprocated heel and/or toe pockets are much more expensive to produce, as compared with the Sarbo type, by reason of the extra time consumed in the knitting. The sock thus developed by Smith did not fit low enough on the foot to give the "bare legged" effect. Nevertheless, on August 11, 1964, U. S. Patent No. 3,143,870 was issued to May on this Smith development.

10. After the development of the extended gore sock, Smith continued to work toward an improved shoe-top-length sock, still without any knowledge of the Sarbo patent or of any footcovers made thereunder, and in approximately August of 1963 Smith hit upon the same combination as the Sarbo patent. On October 4, 1963, the plaintiff May filed an application in the United States Patent Office incorporating the Sarbo concept and started manufacturing and selling foot socks of the Sarbo type. The May application was rejected by the U. S. Patent Office on May 16, 1966, as unpatentable in view of the French Patent to Sarbo (which patent corresponds to the patent in suit), the Grey U. S. Patent (No. 2,333,373 issued November 2, 1943), and the Friedrich German Patent (No. 841,131 issued November 4, 1952).

11. Defendant, Russell Hosiery Mills, Inc., began knitting style 1334 A in October, 1964, and ceased to knit style 1334 A in January, 1965. Defendant's style 1334 B was never commercially produced. In March, 1965, the defendant began knitting its style 1334 C.

12. The Court additionally makes those "Findings of Fact" which appear in the "Discussion" which follows.

## DISCUSSION

### Lack of Invention

Broadly stated, the principal issue in this case is whether Claim 3 of the Sarbo patent[5] is shown to be obvious or known to persons skilled in the art from patents already existing prior to the Sarbo invention or by the knowledge and practices existing in the hosiery industry prior to invention.[6]

The plaintiffs contend that the Sarbo patent relates to a new combination of

---

5. Claim 3 is directed to a combination of elements to form a knitted foot sock, without reciprocal knitting, from a piece of seamless circular knit tubular fabric rather than from cut and sewn flat fabrics or from circular knit fabrics involving reciprocation.

6. 35 U.S.C.A. § 102 provides in part:
"§ 102. *Conditions for patentability: novelty and loss of right to patent*
"A person shall be entitled to a patent unless—
"(a) the invention was known or used by others in this country, or patented or described in a printed publication in this or a foreign country, before the invention thereof by the applicant for patent, or
"(b) the invention was patented or described in a printed publication in this or a foreign country or in public use or on sale in this country, more than one year prior to the date of the application for patent in the United States, or * * * *"

35 U.S.C.A. § 103 provides:
"§ 103. *Conditions for patentability; non-obvious subject matter*
"A patent may not be obtained though the invention is not identically disclosed or described as set forth in section 102 of this title, if the differences between the subject matter sought to be patented and the prior art are such that the subject matter as a whole would have been obvious at the time the invention was made to a person having ordinary skill in the art to which said subject matter pertains. Patentability shall not be negatived by the manner in which the invention was made. July 19, 1952, c. 950, § 1, 66 Stat. 798.

known elements, the combining of which would not have been obvious at the time it was done. It is admitted by the plaintiffs that seamless knitted tubes, incorporation of rubber threads in knitted fabrics and the sewing of seams transversely across the lower end of a piece of tubular fabric were all old and known in the art prior to the Sarbo concept in 1958, leading to issuance of the patent in suit.

Thus, since admittedly all elements of Claim 3 are old, it becomes the duty of the Court to scrutinize the claim under the exacting standards established where inventiveness is claimed in an assembly of old elements. Great Atlantic & Pacific Tea Co. v. Supermarket Equipment Corp., 340 U.S. 147, 152, 71 S.Ct. 127, 95 L.Ed. 162, 167 (1950); Heyl and Patterson, Inc. v. McDowell Co., Inc., 4 Cir., 317 F.2d 719, 722 (1963).

■ The improbability of finding invention in a combination patent is a recognized premise in many cases, but where the combination of old and known elements "perform or produce a new, different or additional function or operation in the combination than that theretofore performed or produced by them" patentability has been recognized. Great Atlantic & Pacific Tea Co. v. Supermarket Equipment Corp., supra; Entron of Maryland, Inc. v. Jerrold Electronics Corp., 4 Cir., 295 F.2d 670 (1961).

In City of Grafton, W. Va. v. Otis Elevator Co., 4 Cir., 166 F.2d 816, 817 (1948), Judge Dobie, writing for the court, sets out some requisites for a valid combination patent:

"We are dealing here with a combination patent. The requisites for a valid combination patent are thus set out, with an elaborate citation of authorities, in 40 Am.Jur. 543, § 19: 'A combination is a composition of elements, some of which may be old and others new, or all old or all new. It is, however, the combination that is the invention, and is as much a unit in contemplation of law as a single or noncomposite instrument. The authorities establish the following propositions respecting the patentability of devices or processes of this character: (1) that a combination is patentable if it produces new and useful results, although all its constituents were well known and in common use before it was made, provided the results are a product of the combination, and not a mere aggregate of several results, each the product of one of the combined elements; (2) if it produces a different force, effect, or result in the combined forces or processes from that given by their separate parts, and a new result is given by their union; (3) if it either forms a new machine of distinct character or formation, or produces a result which is not the mere aggregate of separate contributions, but is due to the joint and co-operating action of all the elements; (4) when the several elements of which it is composed produce by their joint action, either a new and useful result, or an old result in a cheaper or otherwise more advantageous way.' "

■ To be patentable, the product or process must not only be a new and useful improvement over the prior art but also must not be obvious to one of ordinary skill in the particular art.

The evidence is convincing that the Sarbo sock was an improvement over the prior related socks. But to say an improvement is made is not to say patentable invention is present, because there must be the creation of something which did not exist before, possessing elements of novelty and utility in kind and measure different and exceeding that which the art might expect from those skilled in the art.

The defendants contend that Claim 3 of the patent in suit is clearly invalid because each and every one of the elements is old and functions in exactly the same way that it always functioned. Long before 1958, the circular knitting machine was used to knit a tubular fabric to extend around and cover the leg

member of the wearer. The seaming or looping opposite the end for the foot entry had been the customary way to close the foot end of a sock long prior to the Sarbo concept. The incorporation of rubber thread in the upper rim portion was known and used in hosiery manufacture for years prior to the Sarbo concept. The defendants argue that none of these elements in combination perform any function not previously served by them.

However, the question is not simply that of whether the old elements contained in the combination each performs its old function, but whether the elements making up the new combination produce a new, different or additional function or operation than that previously produced. There is no evidence that laid-in rubber or elastic yarn previously served the function of holding in place a sock located below the ankle and entirely within the shoe.

The "obviousness test" prescribed by 35 U.S.C. § 103 is difficult of application, but some guides have been given. It is to be remembered that in applying the test in the subject case the crucial date is 1958, the year the invention was made. Judge Learned Hand in Reiner v. I. Leon Co., 2 Cir., 285 F.2d 501, 503, 504 (1960) expressed some general guides to be followed in applying the test of whether the subject matter of a patent would have been obvious to one of ordinary skill in the art of the time of the claimed invention. He stated:

"The test laid down is indeed misty enough. It directs us to surmise what was the range of ingenuity of a person 'having ordinary skill' in an 'art' with which we are totally unfamiliar; and we do not see how such a standard can be applied at all except by recourse to the earlier work in the art, and to the general history of the means available at the time. To judge on our own that this or that new assemblage of old factors was, or was not, 'obvious' is to substitute our own ignorance for the acquaintance with the subject of those who were familiar with it. There are indeed some sign

posts: e.g. how long did the need exist; how many tried to find the way; how long did the surrounding and accessory arts disclose the means; how immediately was the invention recognized as an answer by those who used the new variant?" Reiner v. I. Leon Co., 2 Cir., 1960, 285 F.2d 501, 503, 504."

In the *Entron* case, supra, Judge Sobeloff writing for the court, after quoting the above language from the opinion written by Judge Hand in the *Reiner* case, states that "[t]hese general principles have, for many years, guided the decisions of this circuit." Also, see Marston v. J. C. Penney Co., 4 Cir., 353 F.2d 976, 982 (1965).

The demand and need for the Sarbo-type sock is confirmed by the fact that the plaintiffs since commencing manufacture and sale of the sock in 1963 have sold in excess of 5,000,000 pairs. This figure does not take into consideration market consumption of the Sarbo-type sock manufactured by the defendant, Russell Hosiery Mills, Inc. The evidence discloses phenomenal success in marketing the Sarbo sock immediately after manufacturing was begun by the plaintiffs.

Further, it is evident that the need had been recognized in the industry for many years prior to 1958. Indeed to fulfill the need the plaintiffs had its employee, C. T. Smith, as early as 1958, working to perfect a Sarbo-type sock, which he did perfect, without knowledge of Sarbo's prior invention, some four years later in 1963. The prior art socks were expensive to manufacture in that cutting and sewing were time consuming, required skilled operators, and the sewn-in rubber rim was uncomfortable and irritable to the foot.

In the subject case the unobviousness of the plaintiffs' combination is shown by the failure of the defendant Russell Hosiery Mills, Inc., admittedly a strong contender in the manufacture of shoe-top or ankle length foot socks, to develop the Sarbo-type sock. Mr. Earl A. Connelly, Executive Vice President of Russell Ho-

siery Mills, Inc., charged according to his testimony with responsibility for developing new products, testified that he saw the Sarbo sock in June or July, 1964; that when he saw it he was not impressed with it, but that after commercial production was started by Russell Hosiery Mills, Inc., in about October, 1964, he changed his mind. Mr. Connelly is a college graduate, with a Bachelor of Science Degree, and with a long and varied experience in hosiery development. While the test of obviousness should not and cannot be determined by one man skilled in the art, such as Mr. Connelly, it is significant that the Sarbo combination was not obvious to Mr. Connelly. Neither was it obvious to Mr. C. T. Smith, plaintiff's technician in charge of development, as it took some years to arrive at the Sarbo concept. Both Mr. Connelly and Mr. Smith had for years had experience with circular knitting whereby a tubular fabric was knit. Also, both had experience with looping or seaming of socks at the foot end and laying in rubber or elastic threads with a knitting machine at the top of the sock to hold it up.

Much prior to 1956, the provision of rubber or elastic yarn in the top part of hosiery to hold them up was well known. It was a common practice to use such yarn in knee-length hosiery, anklets and crew socks. It is apparent that those skilled in the art, probably due to the irregular configuration of the foot as compared with the uniform configuration of the ankle and leg members, could not accept or grasp the idea that rubber or elastic yarn could be laid in with proper tension to keep a below the ankle length sock on the foot. In fact, Mr. Connelly testified that in knitting the Sarbo-type sock at Russell Hosiery Mills, Inc., trouble was incurred with it "from the standpoint of it popping off at the back of the heel." The combination of Claim 3 of the patent in suit teaches a new and useful result, that is, the old elements could be joined to make a shoe-top-length sock that would stay up on the irregular contours of the foot and could be comparatively cheaply manufactured,

The combination in the subject patent cannot rightly be compared with that described in *Great Atlantic & Pacific Tea Co*, supra, where the combination consisted of the mere elongation of a merchant's counter with a three-sided apparatus, with no floor, affixed to the counter in guides to pull groceries forward to the checking clerk.

*Prior Patents*

The defendants have cited in excess of twenty patents in support of their contention that the Sarbo patent is invalid. Primarily the defendants have relied upon the disclosures in the following patents as showing anticipation or lack of invention:

Teichmann British Patent No. 184,470, issued March 8, 1923

Teichmann Swiss Patent No. 102,524, issued December 1, 1923

Teichmann German Patent No. 362,040, issued October 21, 1922

Teichmann U. S. Patent No. 1,724,784, issued August 13, 1929

St. Pierre U. S. Patent No. 2,246,079, issued June 17, 1941

Grey U. S. Patent No. 2,333,373, issued November 2, 1944

Herbert U. S. Patent No. 2,344,773, issued March 21, 1944

Herbert U. S. Patent No. 2,400,692, issued May 21, 1946, and

Vendetti U. S. Patent No. 2,881,603, issued April 14, 1959.

Actually, each of the individual elements of Claim 3 of the patent in suit is disclosed in one or more of the patents cited by the defendants. Nevertheless, the Court finds that in none of the prior patents cited was there disclosed the combination revealed by Claim 3 of the patent in suit, and that the combination disclosed by Claim 3 produced a new and useful result not previously disclosed.

The defendants place much emphasis upon the Teichmann patents, especially the Teichmann British Patent No. 184,-470, issued March 8, 1923. In the opinion of the Court, one must indulge in

speculation to conclude that Claim 3 of the patent in suit was anticipated by the claims of Teichmann. While Patent Office drawings are not to be relied upon for details,[7] it is of note that Figure 2 of the British Teichmann shows supposedly tubular barrel shape fabric. Even now, there is not a commercial machine that will knit a barrel shape tubular fabric. A fabric can be knitted as a flat fabric and then cut and sewn into barrel shape. All the while, the Teichmann patents were available to the Patent Office. Neither of the Teichmann patents was cited in the Sarbo patent, but the Grey patent was cited in the Sarbo patent, and the Grey patent issued in 1942 cited both the United States and Swiss Teichmann patents. In reading the British Teichmann patent, and looking at the drawings, it could be surmised that the sock described was made to be worn below shoe top level, but the patent does not state that a sock designed to be worn completely within the confines of the shoe is claimed. In fact, using the cord or lacing device described would reasonably preclude its use as a beneath the shoe sock. In any event, the Teichmann patents apparently did not teach or make obvious the product which is the subject of the patent in suit as it is apparent that more than forty years after Teichmann, and long after circular knitting, rubber yarn and looping or seaming were known, those in the industry were trying to resolve the problem.

The Swiss Teichmann and German Teichmann patents are similar to the British Teichmann except no express provision is made for a cord or lacing device and contrary to the British Teichmann specifically states that the fabric is knitted. The U. S. Teichman discloses a foot garment but of the cut and sewn type.

St. Pierre U. S. patent and Vendetti U. S. patent were cited in the Sarbo application and disclose the use of elastic yarn in knitted socks, but do not relate its use to socks designed for wear entirely within the confines of the shoe.

Grey U. S. patent was cited in the Sarbo file wrapper. It discloses a shoe-top-length foot sock of seamless tubular knit fabric, closed across the bottom with a curved seam. The top of the garment is provided with a welt instead of elastic. The Grey sock is boarded to give it the desired shape and it is concluded could not be reversed so as to wear the toe-portion at the heel. Also, by reason of the curved seam, there must be some cutting and sewing to make the sock.

The Herbert U. S. patents disclose a circular knit shoe-top-length foot sock. However, the sock is shaped in the toe portion by cutting and sewing.

Elements of the Sarbo patent can be found in the patents cited, but the Court cannot find that the prior art completely anticipates and makes obvious the patent in suit.

### Indefiniteness of Claim 3

Claim 3 of the patent in suit provides for a foot cover with "the same knitting structure throughout." It is contended by the defendants that this provision is indefinite and violative of the requirement of particularity and distinctness in claims.[8]

■ To be patentable, an invention must be capable of accurate definition and particularly defined. This requirement is complied with only when what existed in the art before is distinguished from what is claimed and it is made clear that which is foreclosed from future

---

7. Toledo Scale Co. v. Barnes Scale Co., 18 F.2d 965 (E.D.Mich.1927).

8. 35 U.S.C.A. § 112 provides in part:
"The specification shall contain a written description of the invention, and of the manner and process of making and using it, in such full, clear, concise, and exact terms as to enable any person skilled in the art to which it pertains, or with which

it is most nearly connected, to make and use the same, and shall set forth the best mode contemplated by the inventor of carrying out his invention.

"The specifications shall conclude with one or more claims particularly pointing out and distinctly claiming the subject matter which the applicant regards as his invention. * * * "

use. United Carbon Co. v. Binney & Smith Co., 317 U.S. 228, 63 S.Ct. 165, 87 L.Ed. 232 (1942); Marshall v. Proctor & Gamble Mfg. Co., 210 F.Supp. 619 (D. Md.1962).

The phrase "knitting structure" is a term used to describe the direction the loops are pulled in relation to the fabric knitted. Basically there are three types of stitches: the flat, rib, and pearl stitches. A change in the knitting structure is obtained by changing the type stitch. The flat stitch is made by pulling all the loops to the base of the fabric; the rib stitch is made by pulling an even number of loops to the face of the fabric and an even number to the back of the fabric; and the pearl stitch is made by pulling all of the loops to the face of the fabric for a given number of courses and then pulling all the loops to the back of the fabric for a given number of courses.

■ It should be remembered that the defendants are attacking a patent duly considered and issued by the Patent Office, and that, therefore, a presumption of validity surrounds the patent. 35 U.S. C.A. § 282. Further, the commercial success is significant. While commercial success is no substitute for inventiveness, it is an important factor in a borderline case.

It appears to the Court, and the Court so finds as a fact, that the term "same knitting structure" is sufficiently definite that those skilled in the knitting art would be capable of determining the limits of the claim, and that considering the claim, in the light of the specifications, it reasonably informs those skilled in the art of its scope. The Court is of the opinion that it is not essential to validity to state the exact type stitch to be used to the exclusion of all others.

The statutory requirement of particularity and distinctness has been met in the Sarbo patent.

*Infringement*

■ Before the defendants can be found to have infringed the plaintiffs' patent, the plaintiffs must show that every essential element of the combination, or its equivalent, is embodied in the alleged infringing product.

Only defendants' styles 1334 A and 1334 C are accused of infringing. It appears that style 1334 B was not commercially produced by the defendants. There is no difference between styles 1334 A and 1334 C except that in style 1334 C the upper portion of the sock is made of lighter yarn with a shorter stitch than the lower portion, i. e., the lower portion is made of 70 denier yarn with less tension permitting a longer stitch while the upper portion is made of 50 denier yarn.

It is contended by the defendants that the change from the lighter yarn to the heavier yarn with less tension makes the sock fit better as there is more stretch.

This change is hardly perceptible to one not skilled in the art, and the Court regards this as an insignificant change.

Both of the accused styles, i. e., 1334 A and 1334 C, are made from a piece of seamless tubular fabric circular knitted without reciprocation. In both accused styles a rim is provided at the upper foot opening portion with rubber threads in the rim to hold the sock in place. In addition, when knitting is completed and before any further processing is done, both styles are symmetrical in form, sometimes commonly referred to as "pouch-like." After the knitting is completed, the lower portion is closed by knitting or seaming across the bottom. The only difference between style 1334 A and style 1334 C, as previously pointed out, a heavier yarn with less tension is knitted into the lower portion of the sock.

Hence, the same combination of elements is joined to form the defendants' styles 1334 A and 1334 C that is joined to make the foot sock of the plaintiffs, and the foot socks made pursuant to the patent in suit and the accused styles of the defendants are exactly the same unless the change to a heavier yarn with a longer stitch in defendants' style 1334 C effects a change in knitting structure.

The Court cannot find that changing from one weight or size yarn to another, using a different tension, effects a change in knitting structure. Such, in the opinion of the Court, does not avoid infringement.

It is concluded that the defendants' styles 1334 A and 1334 C infringe the plaintiffs' patent.

### Liability of Individual Defendant, Paul Russell

The evidence is not persuasive that the defendant, Paul Russell, committed acts with such deliberateness as to make him individually liable. It is held that the defendant, Paul Russell, is not liable to the plaintiffs or either of them.

## CONCLUSIONS OF LAW

1. The Court has jurisdiction of the parties.

2. This is an action arising under the patent laws of the United States, and the Court has jurisdiction of the subject matter by the terms of 28 U.S.C.A. § 1338(a).

3. Claim 3 of the Sarbo United States Patent No. 3,059,458 is valid for the reasons before stated.

4. Defendants' styles 1334 A and 1334 C infringe Claim 3 of the Sarbo United States Patent No. 3,059,458.

5. The individual defendant's motion to dismiss should be allowed.

6. Only in a case involving exceptional circumstances should the Court in the exercise of its discretion award attorney's fees. Berry Brothers Corporation v. Sigmon, 4 Cir., 317 F.2d 700 (1963). Such exceptional circumstances are not found in this case, and therefore, attorney's fees are not awarded.

7. The defendants have not knowingly and deliberately infringed Claim 3 of the plaintiffs' patent and have diligently and honestly sought to avoid infringement.

8. The plaintiffs are entitled to an accounting as to the defendants' manufacture of styles 1334 A and 1334 C, and upon motion by the plaintiffs, the Court will appoint a Master to determine the extent, if any, of plaintiffs' damages.

The foregoing opinion incorporates those findings of fact and conclusions of law deemed necessary by the Court for the disposition of the case. However, counsel may, of course, within the period provided by the Federal Rules of Civil Procedure submit requests for further or more specific findings or conclusions.

Counsel may agree upon a form of judgment conforming with this opinion.